IN THE MATTER OF JOHN PEREZ, AN ATTORNEY AT LAW.

Argued October 22, 1985—Decided November 3, 1986.

*David E. Johnson, Jr.,* Director, argued the cause for Office of Attorney Ethics.

*S.M. Chris Franzblau* argued the cause for respondent (*Franzblau, Falkin & Goldman,* attorneys).

PER CURIAM.

This disciplinary proceeding results from a random compliance audit of the trust funds of respondent, John Perez, by the Division of Ethics and Professional Services (Division) pursuant to Rule 1:21–6(c). At the time of the audit, respondent was a sole practitioner. Upon receipt of the auditor's report, the Division filed a Notice of Motion with the Disciplinary Review Board (DRB), that respondent be temporarily suspended from the practice of law on the grounds of his continuing and significant invasion and misuse of client trust funds, use of trust accounts for personal purposes, and failure to maintain records required by Rule 1:21–6, all in violation of *DR* 9–102(A),

(B) and (C).[1]   The DRB denied the Division's motion on the condition that respondent cease practice as a sole practitioner, enter into the employ of a law firm, and have no involvement in or responsibility for the financial aspects of the practice.   Respondent continued in the employ of the law firm until September 1985 when he ceased practicing law and went into business. Based on the findings resulting from the compliance audit of respondent's trust account, the District V–A Ethics Committee (DEC) filed a complaint.   After a hearing, it concluded that respondent had violated *DR* 9–102(A), 9–102(B)(3), 9–102(B)(4), and 9–102(C), and recommended a public reprimand.

## I

The DRB conducted a hearing.   It then issued its Decision and Recommendation, which summarized the charges and relevant evidence in pertinent part as follows:

### 1.  BUCCA–BERVAN LIQUORS

In April 1981 Joseph Bucca, a close friend, asked Respondent to lend him $3,500, the amount he needed to meet the $30,000 sale price for real estate and a liquor license.   Respondent who had anticipated borrowing $20,000 received only 12,000.   In the interim, he had promised to lend money to Mr. Bucca.

To keep his commitment to Mr. Bucca, Respondent withdrew funds from a trust account in the name of 814 Parker Street, Inc., owned by a close friend, William Whiteman.   On April 8, 1981, Respondent had deposited in this account $3,500 as part of the proceeds of a real estate transaction.   Before he mailed the closing documents and his trust check to Mr. Whiteman, Respondent explained in a telephone conversation what he had done.   Respondent maintained that Mr. Whiteman understood and had no problem with the way he handled the transaction.   The check dated May 13, 1981, was deposited by Whiteman on June 29, 1981, at which time it cleared.   In his unpaginated affidavit of April 18, 1983, to the Disciplinary Review Board, Respondent said:

> I know that I should not have taken the funds from the trust account but Mr. Bucca was desperate and I had left him with no alternatives at that moment

---

[1]We refer to the Disciplinary Rules that governed the conduct of attorneys at the time of these occurrences.   Effective September 10, 1984, the Rules of Professional Conduct of the American Bar Association, as modified by the Court, govern that conduct.   Rule 1:15.   Those Rules contain provisions equivalent to the Disciplinary Rules involved here.

because he had expected the money from me [Respondent's affidavit, page 7, paragraph 1].

## 2. GOMES AND MARTIN

Respondent represented Mr. Gomes and Mr. Martin in a real estate closing on March 15, 1982. Respondent never deposited the cash paid to him for fees and disbursements. In closing out the file, Respondent disbursed a total of $403 from the trust account on May 14, 1982. Several months later when he was reconciling his trust accounts, he noticed that he had not deposited funds to cover the disbursements. On August 10, 1982, Respondent deposited $403 to balance out the account.

## 3. EXXON/CUOZZO MATTER

On April 15, 1982, Respondent received $4,000 in cash from Anthony V. Cuozzo to be used for the purchase of property. Since the banks were closed, he took the money home and secreted it. While attending funeral services for his father-in-law, he learned his home had been burglarized. At that time, he had forgotten about the money and did not report it as stolen. When he began reconstructing his accounts, he realized that he had not deposited the $4,000. He also realized there had not been funds in the account to cover the check for $2,093 that was issued to Exxon on April 21, 1982.

## 4. AFONZO AND MERCHANT/CLOVER MATTER

On May 5, 1982, Respondent deposited $4,000 into his trust account to the credit of the Merchant/Clover transaction. Disbursements totalling $3,141.30 were made on June 9, 1982. Respondent's trust account, however, had a negative balance of $77.71 as of June 7, 1982. On June 9, 1982, Respondent deposited $8,467.66 into his trust account on behalf of the Afonzo real estate closing, the same date as the Merchant/Clover disbursements. The Afonzo trust funds were therefore invaded.

In addition to the above matters, the auditors concluded that: Respondent had used a $4,000 deposit he received May 5, 1982, for other clients, and in another case, that he invaded the trust funds of a client in the amount of $4,129.81. The auditors further found interest charges for a $9,500 loan by Respondent were automatically charged by the bank against Respondent's trust account.

Respondent admitted that he withdrew funds from his trust account, denied any intentional misappropriation, and stated that he was unable to keep his books or administer his office as he should have over the period in question because of the death of his father-in-law and the serious illness of his wife and son. He also noted that none of his clients had suffered any loss by reason of his infractions.

Upon its review of the record, the DRB found that the DEC's finding of unethical conduct on respondent's part was fully

supported by clear and convincing evidence. Specifically, the DRB found that:

Respondent misused $3,500 from the trust account of William Whiteman so he could honor his commitment of loaning that amount to another friend, Joseph Bucca. Although Respondent later obtained permission of the client to do this, this came after the fact. He acknowledged that he knew this was wrong, but claimed he did so because Mr. Bucca was desperate and relied upon his promise. The Board further finds Respondent in several situations utilized clients' funds for the benefit of other clients, also that he disbursed funds against trust accounts before he received any funds. The Board finds Respondent failed to: (1) preserve the identification of client's funds, *DR* 9–102(A); (2) maintain complete records of funds coming into his possession and render appropriate accounting to his clients, *DR* 9–102(B)(3); (3) promptly pay to clients funds in his possession, *DR* 9–102(B)(4); and (4) comply with the record keeping provisions of *R.* 1:21–6.

More significantly, the majority of the DRB found that:

Respondent did not knowingly misappropriate funds from his trust account. Since his recordkeeping was virtually nonexistent, the Board majority concludes that he acted recklessly or negligently. The situation here is unlike that of *Wilson, supra,*[2] where the money was used knowingly for the attorney's own benefit. Here, Respondent commingled the funds between his clients.

In determining the proper discipline for respondent, the DRB studied respondent's misconduct as well as his character and background. Specifically, the DRB considered the many hardships Perez and his family endured as he worked his way through college and law school, as a police officer; the numerous departmental commendations he received as a police officer, including the highest, the medal of honor; and the difficulties he faced as a new attorney because of the severe illnesses of his wife, son, and father-in-law. Additionally, the DRB reviewed his lack of a prior disciplinary record, his acceptance of full responsibility for his actions, and his cooperation fully with the ethics investigation.

The majority of the DRB recommended that respondent be suspended from the practice of law for two years. One member of the DRB recommended that respondent be disbarred. The Office of Attorney Ethics disagreed with the DRB's recom-

---

2*In re Wilson,* 81 *N.J.* 451 (1979).

mendation, concluding that respondent's conduct constituted misappropriation, and hence, under *In re Wilson*, 81 *N.J.* 451 (1979), he should be disbarred.

We issued an Order to Show Cause why respondent should not be disbarred or otherwise disciplined. Although the respondent's attorney appeared at the DEC and DRB hearings neither respondent nor Mr. Whiteman testified before the DEC or DRB. Accordingly, the DEC and the DRB both decided the matter solely on Mr. Gerard's affidavit and supporting documents, respondent's affidavit, and briefs by respondent's attorney and the OAE. We determined this record to be incomplete and unclear and after the hearing on the Order to Show Cause, we temporarily remanded the matter to the District V–A Ethics Committee for a hearing to develop a full and complete record on whether there was a knowing misappropriation by respondent of the funds of William Whiteman or whether there was consensual use of such funds.

Pursuant to our order, the DEC conducted a hearing. It was at this hearing that respondent first testified in this matter. Likewise, Mr. Whiteman first testified at this hearing. He stated he is a police officer and had been a close friend of the respondent since they were partners on the police force. The testimony adduced at the hearing about the transaction was as follows:

In March 1981, 814 Parker Street, Inc. ("seller"), a New Jersey corporation represented by respondent, entered into a Contract of Sale for premises to the Dancsecs ("purchasers") who were independently represented. The Contract of Sale provided that upon its execution the purchasers would pay to the seller the sum of $3,500 to be held in escrow by respondent. On April 8, 1981, the sum of $3,500 was forwarded to respondent to be held in escrow "until settlement of title."

The respondent testified that he had previously promised to loan his friend Mr. Joseph Bucca approximately $3,500 to purchase a liquor store. About April 20, 1981, Bucca requested

and received from the respondent the sum of $3,500. The respondent testified that he paid to Bucca the monies forwarded to him by the attorney for the purchasers in the pending 814 Parker Street transaction. These monies were to be held in escrow by respondent until the closing scheduled for May 15, 1981. The closing took place on or about May 1, 1981.

The respondent testified that on or about April 20, 1981 (the date on which he needed the monies to pay to Bucca), he spoke to his client Mr. Whiteman, President of 814 Parker Street, Inc. The respondent stated that he requested a loan from Mr. Whiteman so that the respondent could loan money to Mr. Bucca. The respondent testified that Mr. Whiteman agreed to permit him to take the money out of the escrow funds that the respondent was holding on the Parker Street closing. Thus, the respondent testified, with Mr. Whiteman's consent, he forwarded the escrow monies to Mr. Bucca.

Mr. Whiteman testified on behalf of the respondent that, indeed, this conversation did take place approximately two weeks to one month before the Parker Street closing. Mr. Whiteman further testified that he had agreed to loan money to the respondent by permitting the respondent to use the escrow monies in the Parker Street transaction.

On or about May 5, 1981, the respondent forwarded a letter to Mr. Whiteman enclosing two checks: (a) a trust check from purchaser's counsel in the amount of $6,307.27; and (b) a check from the respondent made payable to 814 Parker Street Inc. dated May 13, 1981 in the amount of $3,180 ($3,500 less counsel fees and costs). Both respondent and Whiteman agreed that this $3,180 check would not be cashed at the time Whiteman received the check.

The DEC concluded from this evidence that the respondent used the funds being held by him in escrow to lend money to Mr. Bucca. The DEC also found that *there was consent on the part of Mr. Whiteman for the respondent to utilize the*

*sum which was being held in escrow in the Parker Street transaction, for his own purposes.* However, the Panel finds that neither the purchasers nor their attorney knew that the escrow funds were to be used for purposes other than the real estate transaction." (emphasis added).

Moreover, the DEC concluded:

Since he [respondent] failed to obtain the consent of both parties, it is the conclusion of this Panel that respondent has violated his fiduciary duty to properly maintain the escrow fund. *See* DR9–102. An attorney's personal use of trust fund monies is a violation of that fiduciary duty. *In re Wilson,* 81 *N.J.* 451 (1979); *In re Power,* 72 *N.J.* 452 (1977). Moreover, an attorney's professional obligation in such matters "reaches all persons who have reason to rely on him even though not strictly clients. *In re Lambert,* 79 *N.J.* 74, 77 (1979)."

After considering the DEC's findings, the DRB reaffirmed its prior recommendation, noting that:

Whether the permission of his client to improperly utilize escrow funds was obtained prior or subsequent to the improper disbursement of the trust funds is irrelevant. Escrow funds were clearly misused. *In re Hollendonner,* 102 *N.J.* 21 (1985). Coupled with respondent's other derelictions as found in the Board's opinion, a two-year suspension is warranted.

One member of the DRB continued to vote for disbarment.

Upon its review of the DEC's report, the OAE changed its prior recommendation for disbarment and based upon the new facts adduced at the DEC hearing, particularly the undisputed testimony of Mr. Whiteman that he had consented to the use of the escrow funds by respondent, concluded that the DRB's recommended discipline of two years suspension was appropriate.

Our dissenting colleagues contend that respondent's testimony at the hearing was false, relying primarily on respondent's and his attorney's perhaps too contrite submissions, namely, respondent's affidavit and brief, and the fact that respondent had not previously asserted that Mr. Whiteman had consented to his use of the funds. In sum, the dissent relies on the record

we deemed to be so incomplete and unclear on the consensual issue as to require a rehearing by the DEC.[3]

It was at the rehearing that respondent and Mr. Whiteman testified for the first time in this proceeding. At the hearing both men's testimony was subject to examination by the members of the DEC and the Director of the OAE. Yet, the DEC and the OAE both concluded, as stated in a letter to the Court from the Director of the OAE:

> As a result of the new facts adduced by me at that hearing and as found by the hearing panel, it is undisputed that Mr. Perez' client, William Whiteman, consented to the use by respondent of escrow funds to which Whiteman would be entitled at an upcoming real estate closing.

An attorney may be found guilty of a disciplinary offense only by clear and convincing evidence. We have carefully reviewed the evidence in this case. We recognize the conflict between respondent's affidavit and his testimony. We are unable to conclude based on this record that the totality of circumstances demonstrates clearly and convincingly that Mr. Whiteman consented to respondent's use of escrow funds; more importantly, however, neither can we conclude that the record demonstrates clearly and convincingly that Mr. Whiteman *did not* consent to respondent's use of escrow funds.

We must be clearly convinced that there was, in fact, an intentional invasion or knowing misappropriation of clients' funds. As we stated, in *In re Sears,* 71 *N.J.* 175 (1976),

> [t]his high standard emphasizes the reluctance which should characterize a decision to impose a disciplinary sanction and the serious consequences which attend such a decision. As a practical matter, such a decision limits, if it does not preclude, an attorney's opportunity to practice his chosen profession. We

---

[3]Moreover, the dissent's conclusion that respondent's testimony at the rehearing was false leads inevitably to the conclusion that Mr. Whiteman, a police officer, likewise testified falsely under oath. Admittedly Mr. Whiteman is a close friend of respondent; nevertheless, while disbarment is a severe sanction, it is not a prison term and for more than the past year respondent has been in business and presumably has adequately supported himself and his family. We do not accept the dissent's easy assumption that under the circumstances present in this disciplinary proceeding Mr. Whiteman, a police officer, lied to the DEC.

should impose such a restriction only after careful deliberation and only in circumstances which clearly warrant it. [*Id.* at 197–98.]

Based on this record, we are unable to find by clear and convincing evidence that respondent knowingly misappropriated his client's funds.

## II

Nevertheless, we do find that respondent misused the escrow funds he held for his client Mr. Whiteman. *In re Hollendonner,* 102 *N.J.* 21 (1985), was the first case in which we addressed the near identity of escrow funds and trust funds. We held that absent some extraordinary provision in the escrow agreement, the attorney who acts as a depositary of funds in such transactions, "receives the deposit as the agent or trustee for both parties." *Id.* at 28. In that case, "the escrow contract was silent regarding the escrow money, [therefore] it was presumed that these funds were not to be released to the seller until closing of title." *Id.* at 25. Because escrow funds and trust funds are so akin the one to the other in *Hollendonner,* we held that henceforth an attorney found to have knowingly misused escrow funds would confront the disbarment rule of *In re Wilson, supra,* 81 *N.J.* 451 (1979). In *Hollendonner,* we did not apply the rule retroactively because of: (1) the absence of clear and convincing evidence that Mr. Hollendonner invaded the escrow funds with knowledge that the use of those funds was improper, and (2) the fact that the *Hollendonner* decision was the first one in which we addressed the near identity of escrow funds and trust funds. 102 *N.J.* at 29.

In this case, the escrow provisions of the contract of sale unmistakenly provided that the funds were to be held in escrow by seller's attorney until settlement of title. Respondent had no authority to release these funds without the consent of the purchasers' attorney, which he did not obtain. Therefore, respondent clearly misused the escrow funds and in so doing violated *DR* 9–102. If such conduct occurred after our 1985

*Hollendonner* opinion, it surely would "confront the disbarment rule of *In re Wilson.*" *In re Hollendonner, supra,* 102 *N.J.* at 28.

Respondent's misconduct, however, antedated our decision in *Hollendonner.* Since *Hollendonner* was "the first occasion on which we addressed the near identity of escrow funds and trust funds," *Id.* at 29, and since the strict application of the *Wilson* rule to respondent's misuse of escrow funds would result in his disbarment, it would be unfair to apply *Hollendonner* retroactively to respondent. This conforms to our decision in *In re Smock,* 86 *N.J.* 426 (1981), where we held that because of the severity and inflexibility of the *Wilson* rule, it should not be applied retroactively.[4] As in *Wilson* a significant, although not paramount, element of *Hollendonner* is its deterrent effect on the bar. Retroactive application of the doctrine does not in any way serve that deterrent purpose.

■ Respondent's other misconduct stems primarily from his lack of books and records. Respondent's recordkeeping was so bad as to be virtually nonexistent.[5] While we sympathize with the difficulties newly admitted attorneys face when they enter practice as a sole practitioner, they like all other attorneys have an obligation to know and to follow applicable Court Rules

---

[4]In *In re Verdiramo,* 96 *N.J.* 183, 186 (1984), we noted that previously there had not been a uniform approach to discipline in cases that involve criminal acts of dishonesty that directly undermine the administration of justice. Therefore, although such misconduct "involving the commission of crimes that poison the well of justice is deserving of severe sanctions and would ordinarily require disbarment," we did not disbar Mr. Verdiramo. *Ibid.* Likewise, in *In re Kushner,* 101 *N.J.* 397 (1985), we did not disbar Mr. Kushner for his misconduct, which, though similar to that of Mr. Verdiramo, antedated our decision in *Verdiramo.*

[5]Although we are troubled by respondent's handling of $4,000 cash in the Exxon/Cuozzo matter, nevertheless, this concern standing alone, supported by the undisputed evidence that there was a robbery of respondent's home while he was at his father-in-law's funeral, is not sufficient to establish by clear and convincing evidence that respondent misappropriated his clients' trust funds.

regarding trust account procedures. *See In re Templeton,* 99 *N.J.* 365, 372 (1985), in which we found that the pressures on a new attorney practicing as a sole practitioner "cannot be permitted to diminish an attorney's responsibility to his client."

■ We have carefully canvassed the record, mindful of our obligation to make independent findings of fact as judged by the requisite standard of clear and convincing evidence, and are in agreement with the findings of the DRB in respect of the respondent's various ethical infractions. Thus, we conclude based on our independent review of the record that respondent failed to (1) preserve the identification of his clients' funds, *DR* 9–102(A), (2) maintain completed records of the funds coming into his possession and render appropriate accounts to his clients, *DR* 9–102(B), (3) promptly pay to clients funds in his possession, *DR* 9–102(B)(4), and (4) comply with the recordkeeping provisions of Rule 1:21–6.

■ We are mindful that the purpose of discipline is not to punish the offender but to protect the public from the attorney who does not meet the standards of responsibility of his profession. *In re Goldstaub,* 90 *N.J.* 1, 5 (1982); *In re Hughes,* 90 *N.J.* 32, 36 (1982); *In re Stout,* 75 *N.J.* 321, 325 (1978). Here, the record does not support a conclusion that respondent's misconduct was based on dishonesty, venality, or immorality. Respondent's misconduct does not lead to a conclusion that his "good character and fitness have been permanently or irretrievably lost," *In re Templeton,* 99 *N.J.* 365, 376–77 (1985), so as to warrant disbarment.

For all of these reasons, we conclude that respondent should be suspended from the practice of law for two years.

We further direct respondent to reimburse the Ethics Financial Committee for costs, including but not limited to the cost of producing transcripts.

So ordered.

## ORDER

It is ORDERED that JOHN PEREZ of NEWARK, who was admitted to the bar of this State in 1974, be suspended from the practice of law for a period of two years and until the further order of this Court, effective November 21, 1986; and it is further

ORDERED that JOHN PEREZ reimburse the Ethics Financial Committee for appropriate administrative costs; and it is further

ORDERED that JOHN PEREZ be restrained and enjoined from practicing law during the period of his suspension; and it is further

ORDERED that JOHN PEREZ comply with Administrative Guideline Number 23 of the Office of Attorney Ethics dealing with suspended, disbarred or resigned attorneys.

CLIFFORD, Justice, dissenting.

Unlike the Court, I do not read the record in this disciplinary proceeding as disclosing nothing more than a mere unknowing slip-up in an escrow account a la *In re Hollendonner*, 102 *N.J.* 21 (1985). Rather, the evidence clearly and convincingly demonstrates respondent's knowing misappropriation of client funds, and hence the only appropriate discipline is disbarment. *In re Wilson*, 81 *N.J.* 451 (1979).

### I

Mr. Perez's troubles with the disciplinary authorities began when, in August 1982, he was selected for a compliance audit of his trust account, pursuant to Rule 1:21–6(c). Field visitations to respondent's office between August 31, 1982, and December 13, 1982, uncovered irregularities in respondent's trust account, ultimately summarized in the report of the Disciplinary Review Board (DRB), as recited *ante* at 318–319. Respondent's explanation of several of these irregularities surely strains credulity, particularly the Exxon-Cuozzo matter (respondent

forgot about $4000 in cash of client funds that he had secreted in a dresser drawer of his home, and hence (1) after his house was burglarized failed to report the money as stolen, and (2) wrote a trust account check against those funds, it having slipped his mind that he had not deposited them). But my concern, as well as the majority's, is with the Bucca-Bervan Liquors matter.

The chronology is important. The compliance audit was conducted by Samuel I. Gerard, Esq., an accountant with the Administrative office of the Courts, Division of Ethics and Professional Services (now the Office of Attorney Ethics). During the course of the audit respondent retained the services of an attorney. On March 17, 1982, Mr. Gerard submitted a voluminous affidavit, supported by various documents (cancelled checks, bank records, respondent's records), in which he detailed the results of his audit. On the basis of the Gerard affidavit the Division of Ethics and Professional Services applied on April 20, 1983, to the DRB, pursuant to Rule 1:20–3(i) and Rule 1:20–4(b), for an Order temporarily suspending respondent from the practice of law.

In opposition to the motion to suspend, which the DRB denied, Perez submitted an affidavit dated April 18, 1982. In it he claimed, in effect, that he knew it was wrong to have invaded the trust account for the purpose of loaning trust monies to his friend Bucca, but that after the loan had been made, he notified the client whose money he had taken and secured his after-the-fact approval. Respondent relied on that same affidavit in his answer to the disciplinary complaint filed by the Division of Ethics and Professional Services following a District Ethics Committee member's investigation. That affidavit formed the basis for respondent's defense through every phase of these ethics proceedings until the remand hearing ordered by this Court—that is, the only information submitted by respondent on the Bucca-Bervan Liquors matter was contained in that April 1983 affidavit.

Not until February 1986, at the remand hearing before the District Ethics Committee, ordered by this Court after oral argument before us on an Order to Show Cause why respondent should not be disbarred or otherwise disciplined, did Perez come up with the version that he had used the escrow funds with his client's full consent. More than three years after the compliance audit, three years after his eleven-page explanatory affidavit (three pages devoted to Bucca-Bervan Liquors alone), two years after the District Ethics Committee hearing, almost a year after the DRB hearings, four months after argument in this Court—then it is that Whiteman and Perez testify that in fact they had had a discussion *before* the Bucca-Bervan Liquors closing of April 10, 1981, in the course of which Whiteman authorized Perez's use of his trust monies.

Because respondent's affidavit, made in April 1983, four months after completion of the audit of his books and records, is critical to my view of the matter, I set it out in its entirety as it pertains to the Bucca-Perez Liquors matter.

In or about March of 1981, Joseph Bucca, who was a close personal friend of mine, became interested in acquiring certain real estate at Merchant Street in Newark, as well as a liquor license held by Bervan Liquors, Inc. The total transaction was in the neighborhood of $30,000 and Bucca was unable to come up with the full amount.

In or about April of that year, he approached me to see whether I could loan him the balance needed of about $3,500.

Shortly prior, I held a first purchase money mortgage on certain real estate which I had sold in Pennsylvania. The face amount of the mortgage was $25,000 to be paid in 3 years at 9.5% per annum. In March of 1981, the balance due on the mortgage was approximately $22,000. I was involved in an effort to borrow money for my own personal purposes by using that mortgage as security. I had received a tentative commitment of $20,000 from Garden State Mortgage Company, 744 Broad Street, Newark, New Jersey. I closed on the loan transaction on March 25, 1981. However, I was unable to get more than $12,000 at that time. I understood from Garden State that they were going to find another source and to refinance the deal where I would receive the additional $8,000. When Joseph Bucca came to me to borrow the money in April, I fully expected to complete the mortgage transaction and to get the additional $8,000. I therefore agreed to loan $3,500 to Bucca. Relying on my representation that he would get the money, Bucca went ahead with his transaction and on April 20, 1981 in order to complete his deal, he requested from me two checks, one in the amount of $2,963.24 to Broad National Bank

and the other for $536.76 to the New Jersey Abstracting Co. I gave him the checks from my trust account. I fully expected that on the same day or that on the following day, I would cover the checks with my personal funds to be obtained through Garden State.

As soon as I loaned Bucca the money because he was obviously desperate for the money, I found out that the liquor license which had been owned by Bervan had been sold on that date by I.R.S. for federal taxes assessed against the corporation. Therefore, when I requested immediate repayment from Bucca of the monies when my own mortgage transaction fell through, Bucca was unable to pay me because he had to raise additional monies to pay I.R.S. to redeem the license.

I know that I should not have taken the funds from the trust account but Mr. Bucca was desperate and I had left him with no alternatives at that moment because he had expected the money from me. The monies in the trust account were those of a corporation known as 814 Parker Street, Inc. That corporation was owned by William Whiteman, another close personal friend of mine. On deposit in the account was $3,500 which had been placed there on April 8, 1981, so that it was the Whiteman money which was utilized to complete the Bucca transaction. The Whiteman real estate transaction was closed on May 1, 1981. At the closing, I received a trust check from the attorney representing the purchaser and that check was made payable directly to the 814 Parker Street, Inc. At that time, on May 5, 1981, I wrote a letter to Mr. Whiteman, who had not been present at the closing, and enclosed in that letter all of the closing documents including my trust check for the balance due to him less my attorney fee.

Prior to mailing that, I talked to Mr. Whiteman over the telephone and advised him of the situation concerning the trust account and I also advised him that I would tell him when the check which I sent to him would be good. He advised me that he understood and had no problem with my handling of the transaction.

During the intervening period between the time that the monies were given to Mr. Bucca and the payment of the check to the 814 Parker Street, Inc., I made a series of deposits to the trust account in an effort to bring it back to the level where it was in balance.

I never quite achieved a true balance for reasons which are lost to me now. During the whole period of 1981 and 1982, up to the time of the audit, there was a constant demand upon my time, just to accomplish the business of the office and to take care of personal problems which I had at home. I just did not have the time to devote to the bookkeeping.

The significance of several items in the affidavit is readily apparent:

(1) The money that respondent loaned his "close personal friend" Bucca came from trust funds. It was not respondent's

money—it had been held in trust since April 8, 1981, for William Whiteman, "another close personal friend * * *."

(2) Perez gave Bucca two checks totalling $3500 from his trust account on April 20, 1981, "fully expect[ing] that on the same day or that on the following day, [he] would cover the checks with * * * personal funds to be obtained through Garden State [Mortgage Company]."

(3) Because the Garden State funds did not materialize, the Whiteman trust funds were left short. Respondent therefore made "a series of deposits to the trust account in an [unsuccessful] effort to bring it back to the level where it was in balance."

(4) On May 1, 1981, there occurred the closing of the real estate transaction for which the Whiteman $3500 had been held in trust (Whiteman's corporation was the seller, the $3500 was the buyer's deposit). The balance of the purchase money was paid at the closing by check payable directly to Whiteman's corporation. Whiteman did not attend the closing. On May 5, 1981, Perez wrote Whiteman a letter enclosing the necessary documents and his trust check for the balance due him less his attorney fee.

However, the trust account was still short in respect of the $3500 that respondent had loaned Bucca. Therefore, before mailing the May Fifth letter, Perez "talked to Mr. Whiteman over the telephone and advised him of the situation concerning the trust account and * * * also advised him that [Perez] would tell him when the check which [he] sent him would be good." It was in that conversation, obviously around May 5, 1981, the date of the letter, that Whiteman told Perez that "he understood and had no problem with [respondent's] handling of the transaction." (As we learn from testimony at the remand hearing, Whiteman did not negotiate respondent's trust account check until June 29, 1981.) The affidavit is susceptible of only one meaning about when it was that Perez first obtained Whiteman's acquiescence in his use—actually, misuse—of the

trust funds: on or about May 5, 1981, before posting the letter to Whiteman, but about two weeks *after* the funds had been taken.

(5) And, finally, that Perez recognized his invasion of the Whiteman trust funds for what it was—knowing misappropriation—is put beyond any doubt by this telling sentence from his affidavit:

> *I know that I should not have taken the funds from the trust account* but Mr. Bucca was desperate and I had left him with no alternative at that moment because he had expected the money from me. (Emphasis added.)

The point is obvious: if Whiteman had authorized in advance Perez's use of his money, Perez would have no reason to "know that [he] should not have taken the funds from the trust account." And if Whiteman had in fact given permission in advance, surely that critical event would have surfaced, if not in the affidavit, then somewhere in the course of the District Ethics Committee member's investigation or the District Ethics Committee hearing or the DRB hearing or the brief filed in this Court or the argument before this Court.

Respondent's brief filed in this Court on October 7, 1985, puts the matter to rest: it readily acknowledges that permission to use Whiteman's money was obtained after the money had been taken out of the trust account, as indeed the DRB expressly found. See *ante* at 320.

> [T]he audit revealed that Perez had apparently misused monies from the trust account held in the name of one Whiteman, so he could honor his commitment to loan the money to another friend, a Mr. Bucca. *After the fact, Perez obtained permission from Whiteman to make that loan.*
>
> [Respondent's brief at 3 (emphasis added).]

And:

> In March of 1981, a close, personal friend of respondent's entered into a transaction for the purpose of acquiring a liquor store. In April, the friend, Bucca, approached respondent, requesting a loan of the balance. The respondent, expecting monies from other personal sources, agreed to make the loan. Relying upon the promise, Bucca went ahead with the transaction and shortly thereafter, requested respondent to make the advance as promised. Respondent gave him $3,500 from his trust account, fully expecting that on the same day, he would cover the checks upon completion of a personal business transaction. The money in the trust account, which was used for the loan to

Bucca, was for the account of William Whiteman, another close personal friend of the respondent. The monies had been placed in the trust account in connection with a real estate transaction and *upon completion of the transaction, respondent advised Whiteman of the fact that he had loaned the money to another client and Whiteman agreed to wait for payment.* The money was subsequently paid to Whiteman, to his satisfaction. There was never any intention on the part of respondent to convert any of that money to his own personal benefit.

[Respondent's brief at 6 (emphasis added).]

(The last—absence of intention to convert funds for personal benefit—is, as we all well know, entirely immaterial on the issue of misappropriation. *See In re Wilson, supra,* 81 *N.J.* at 455 n. 1.)

I consider the business developed at the remand hearing, about how, *before* the loan to Bucca, Whiteman authorized the use of his money held in trust, to be nothing less than a belatedly contrived utter fabrication. I do not buy it, any more than I understand how, in the face of all the foregoing, my colleagues in the majority can be left suspended in that fastidious phrenic state reserved exclusively for judges (and maybe some medieval clerics), namely, an exquisite equipoise: the Court cannot conclude that Whiteman *did* consent to respondent's use of his escrowed money, but on the other hand it cannot conclude that Whiteman did *not* consent. See *ante* at 324.

Mercifully, this mild—and, I am confident, short-lived—epidemic of terminal ambivalence has passed me by. Having been spared, I have no hesitancy in recording my conclusion: the record, including the documentary exhibits, demonstrates clearly and convincingly (if need be, beyond a reasonable doubt) that respondent knowingly misappropriated trust funds.

## II

Contrary to my view of the matter, the majority decides that respondent's "most egregious infraction" was his "misuse" of the "escrow funds" he held for the buyer and seller in the Whiteman real-estate transaction; and that because we had not,

until *In re Hollendonner, supra,* 102 *N.J.* 21, spelled out for the uninitiate the "near identity" of escrow funds and trust funds, it would be "unfair" to apply *Hollendonner* retroactively to respondent. *Ante* at 326. That represents a misreading of *Hollendonner,* and hence produces a misapplication of that decision.

Anton Hollendonner held in his escrow account money deposited by the buyer of real property, pending completion of the agreement with the seller, whom Hollendonner represented. 102 *N.J.* at 22. Unlike the contract in *Perez,* which provided specifically that respondent was to hold the $3500 deposit "until settlement of title," the escrow agreement in *Hollendonner* was silent regarding the escrow money. *Id.* at 25. Before taking the escrow funds Hollendonner discussed with his client his need for money; the client authorized the withdrawal of the deposit money as Hollendonner's fee. *Id.* at 26. Thus, unlike *Perez,* Hollendonner thought he was simply taking his own money—an advance on his fee. The vice of the arrangement was that Hollendonner (a) did not explain to his client the obligations of an escrowee, (b) did not obtain the authorization of the buyer to his use of the escrow funds, and (c) in any event did not first move the funds to his business account before using them. But it was primarily because of "the absence of clear and convincing evidence that Respondent invaded the escrow funds with knowledge that the use of those funds was improper," *id.* at 29, that we took an indulgent view of Hollendonner's conduct and imposed a one-year suspension. The contrast with Perez's state of mind could hardly be more stark:

I know that I should not have taken the funds from the trust account * * *.
[Respondent's affidavit at 7.]

Moreover, *Hollendonner* was aimed at those few lawyers who, like Anton Hollendonner but manifestly unlike John Perez, had somehow not wakened to the fact that escrow funds are trust funds. Because *Hollendonner* was the first time we had occasion to *say* that, and because we were satisfied that Hollendonner—again, unlike Perez—did not *know* that, we did not

apply to Hollendonner the *Wilson* rule of disbarment. 102 *N.J.* at 28–29. Hollendonner's misappropriation was unknowing. Perez's was with full knowledge of the wrong.

### III ·

I would not want this opinion to be read as any moral judgment of Perez's conduct. We are not in the business of moralizing. And besides, I admire people who stand by their friends. But lawyers are not free to take clients' money to help their friends.

We did not arrive easily at the conclusion—at least I did not—adopted by a unanimous Court in *Wilson* that

[a]n attorney, beset by financial problems, may steal to save his family, his children, his wife or his home. After the fact he may conduct so exemplary a life as to prove beyond doubt that he is as well equipped to serve the public as any judge sitting in any court. To disbar despite the circumstances that led to the misappropriation, and despite the possibility that such reformation may occur is so terribly harsh as to require the most compelling reasons to justify it. As far as we are concerned, the only reason that disbarment might be necessary is that any other result risks something even more important, the continued confidence of the public in the integrity of the bar and the judiciary.

[81 *N.J.* at 460 (footnotes omitted).]

We have only recently restated our resolve to stand behind the *Wilson* principle, pointing out that since *Wilson*, disbarment for knowing misappropriation has been "invariable." *In re Noonan*, 102 *N.J.* 157, 160 (1986); *see In re Lennan*, 102 *N.J.* 518, 525 (1986). There is nothing about this "knowing misappropriation" case that should shake that resolve.

I would disbar.

POLLOCK, J., joins in this opinion.

*For suspension*—Chief Justice WILENTZ and Justices HANDLER, O'HERN, GARIBALDI and STEIN—5.

*For disbarment*—Justices CLIFFORD and POLLOCK—2.