659 A.2d 460

IN THE MATTER OF LEE W. SHELLY, AN ATTORNEY AT LAW.

Argued January 31, 1995—Decided June 9, 1995.

*Walton W. Kingsbery, III,* Deputy Ethics Counsel, argued the cause on behalf of Office of Attorney Ethics.

*John T. Mullaney, Jr.,* and *Thomas Daniel McCloskey* argued the cause for respondent.

PER CURIAM.

Respondent was admitted to practice law in the State of New Jersey in 1973. He practiced as a solo practitioner in Monmouth County. Respondent has not been the subject of any previous disciplinary action.

This disciplinary proceeding arises out of a complaint filed against respondent by the Office of Attorney Ethics (OAE) alleging five counts of ethics violations relating to his representation of Concetta "Babe" Roden.

I

Counts One, Two, and Three of the formal ethics complaint charged respondent with knowing misappropriation of client trust funds with respect to (1) $40,000 taken from the proceeds of a real-estate closing, (2) a $6,000 deposit in the same real-estate matter, and (3) $1,250 of the closing proceeds that supposedly had

been held in escrow by respondent. Count Four charged a conflict of interest in violation of *RPC* 1.8(a) for failing to advise Ms. Roden to seek the advice of independent counsel regarding a "loan transaction" between respondent and Ms. Roden. Count Five charged respondent with recordkeeping violations contrary to *Rule* 1:21–6(b), (c), (g), and (h), and *RPC* 1.15(d).

Following an evidentiary hearing, Special Master Frank J. Dupignac, Jr. found that respondent knowingly had misappropriated the $6,000 deposit, and that he knowingly had misappropriated $34,000 from the title-closing proceeds. Based on those findings, the Special Master recommended disbarment.

The Special Master further found that respondent's borrowing of his client's money (the $6,000 deposit and the $34,000 from the closing proceeds) without advising her to seek independent legal counsel constituted a conflict of interest in violation of *RPC* 1.8(a). However, he found that the evidence was insufficient to support a finding that respondent knowingly had misappropriated the $1,250 "escrow" from the title-closing proceeds. Finally, the Special Master found that although respondent had violated the recordkeeping requirements of *Rule* 1:21–6 and *RPC* 1.15(d), "the proofs of a knowing misappropriation of funds as a result thereof are less than clear and convincing."

Following a *de novo* review on the record, the Disciplinary Review Board (DRB) found that it could not conclude by clear-and-convincing evidence that respondent knowingly had misappropriated the $34,000 from the closing proceeds. The DRB reasoned:

> [R]espondent's action in setting aside for himself $34,000 from the closing proceeds—albeit this time in the form of a loan—was consistent with the practice he had followed in the nine years of representing Ms. Roden; with her prior consent, her outstanding fees were paid out of monies respondent successfully recovered in her behalf in each matter. There is also respondent's close relationship with Ms. Roden to be considered. Based on the parties' informal and friendly relationship over the years, it is plausible that Ms. Roden agreed to lend respondent some monies, especially if the loan was to be for a short term, as in this instance.
>
> In light of the foregoing, the board cannot conclude, to a clear and convincing standard, that respondent kept the $34,000 without Ms. Roden's consent or,

otherwise stated, that he knowingly misappropriated those funds for his own purposes.

In contrast, a four-member majority of the DRB found that the record clearly and convincingly established that respondent knowingly had misappropriated the $6,000 deposit. The majority noted:

> Even if it were true that respondent obtained the buyers' attorney's and Ms. Roden's consent to the release of the deposit escrowed in his trust account, by respondent's own admission he did not have the buyers' attorney's consent to use those monies for his personal purposes.

Accordingly, the majority recommended that respondent be disbarred pursuant to *In re Hollendonner*, 102 *N.J.* 21, 504 *A.*2d 1174 (1985), and *In re Wilson*, 81 *N.J.* 451, 409 *A.*2d 1153 (1979).

Three members of the DRB who believed that the evidence did not clearly and convincingly show that respondent's use of either the $34,000 or the $6,000 was unauthorized voted to impose a six-month suspension for violations of *RPC* 1.8, *Rule* 1:21–6, and *RPC* 1.15(d).

Based on our independent review of the full record, we are unable to conclude by clear-and-convincing evidence that respondent knowingly misappropriated either the $6,000 deposit or the $34,000 from the closing proceeds. Accordingly, we reject the DRB majority's recommendation that respondent be disbarred under the rule of *Wilson, supra,* 81 *N.J.* at 453, 409 *A.*2d 1153. We instead accept the recommendation of the minority of the DRB and order respondent suspended from the practice of law for a period of six months based on his violations of *RPC* 1.8, *Rule* 1:21–6, and *RPC* 1.15(d).

## II

In 1983, respondent undertook to represent Ms. Roden in several legal matters, including a complex litigation entitled *Roden v. Franceze* ("the Franceze matter"). Most of those matters concerned the distribution of Ms. Roden's family fortune between Ms. Roden and various family members.

Before consulting respondent, Ms. Roden was represented by Richard McManus, Esq. (McManus). Ms. Roden owed McManus $9,890 for his services when she first met with respondent. She did not wish to pay McManus's bill because she was dissatisfied with his representation, and she told respondent that she wanted to file an ethics complaint against McManus. Respondent investigated the merits of her allegations, and when he was convinced they were unfounded, he persuaded her not to file an ethics complaint, insisting instead that Ms. Roden pay McManus's outstanding bill.

John W. Wopat, III, Esq. (Wopat) represented Ms. Roden before McManus. He withdrew as her counsel in that matter because of a conflict of interest. Wopat is the grievant in the present matter.

Ms. Roden had serious financial problems when she first sought respondent's assistance. She was basically penniless; the mortgage on her house was in default and on the verge of being foreclosed. Nonetheless, respondent agreed to represent her after receiving a $1,500 retainer from her employer, a restaurant owner whom respondent represented. Respondent informed Ms. Roden that he would charge her an hourly rate of $150. He also told her that due to her strained financial situation, he would secure payment for his services by drawing his fees from any money he recovered for her. Respondent never reduced that informal, oral-fee agreement to writing. Ms. Roden acknowledged that respondent simply would tell her from time to time that he wanted to take his fees from monies received on her behalf. That arrangement was acceptable to her.

For the first three years after becoming Ms. Roden's attorney, respondent performed legal services for her without receiving any compensation other than the initial $1,500 retainer. In April 1986 respondent received his first fee in the amount of $20,000. He secured that fee as a result of having obtained a partial distribution of $120,000 in a partition action with respect to a certain property owned by a partnership consisting of Ms. Roden and two

of her siblings. Of that $120,000 distribution, respondent disbursed $20,000 to himself in payment of his legal fees after consulting with Ms. Roden and obtaining her consent to do so. Respondent then, at Ms. Roden's instruction, disbursed most of the remaining $100,000 to various banks to which Ms. Roden owed money, including the bank that held the foreclosed mortgage on Ms. Roden's residence. After making those substantial payments, respondent remitted the balance of $1,482.88 to Ms. Roden.

Subsequent to that initial $120,000 distribution, respondent secured many more cash disbursements on Ms. Roden's behalf. In each instance in which respondent secured his fees out of monies he obtained on Ms. Roden's behalf, he first consulted with her and obtained her consent prior to deducting his fee from the distribution.

Several examples are instructive. In October 1986 respondent settled for $10,000 a lawsuit that he had instituted on Ms. Roden's behalf. After learning that Ms. Roden needed at least $8,000 out of those settlement proceeds, respondent retained $2,750 for himself and disbursed to Ms. Roden $8,115.76. (That sum consisted of the remainder of the settlement proceeds plus interest that had accrued on the money held in respondent's trust account for Ms. Roden.) In January 1987 respondent secured a second distribution from the partition action in the amount of $70,000. From that distribution, respondent paid McManus's outstanding bill of $10,-000, disbursed $15,000 to himself, and remitted the remainder to Ms. Roden.

In January 1989 respondent secured a distribution in the amount of $50,000 from a trust of which Ms. Roden was a beneficiary. That distribution was sent directly to Ms. Roden who removed $10,000 and sent the remaining $40,000 to respondent. At Ms. Roden's instruction, respondent used that $40,000 to pay $30,000 to a mortgage company to reduce a second mortgage that Ms. Roden had executed a year earlier. He also retained $10,000 for his legal fees. In April 1989 respondent obtained for Ms. Roden a partial distribution of $108,000 from a trust of which Ms.

Roden was a beneficiary. He retained $15,000 for his legal fees and disbursed the remaining $93,000 to Ms. Roden. In November 1989 respondent secured another trust distribution in the amount of $41,000, retaining $10,000 in legal fees and disbursing the remaining $31,000 to Ms. Roden.

On several occasions, respondent forwarded the entire amount of a distribution to Ms. Roden without a fee deduction. On a few occasions, respondent requested fees directly from Ms. Roden, and she forwarded those fees to him.

In keeping with the extremely informal nature of his professional relationship with Ms. Roden, respondent did not maintain time records with respect to the work he had performed for her. Nor did he send Ms. Roden bills or any documents detailing the type or amount of work he had performed for her. Respondent testified that he had determined the amount, if any, to be deducted for his fees from each distribution based generally on the amount of time spent on each matter; however, he also had considered Ms. Roden's financial needs and ability to pay.

The record reveals that over the course of his nine-year representation of Ms. Roden, respondent secured approximately $530,000 for her. In addition, as will be detailed below, respondent obtained a judgment in her favor in the Franceze matter totaling approximately $395,000. He also successfully negotiated and handled the sale of her house. For the work that he performed during the nine years of representing Ms. Roden, respondent received payment for his services in the total amount of approximately $100,000.

Notwithstanding respondent's success in obtaining substantial monetary recoveries for Ms. Roden, she was unable to establish any financial stability during the period that respondent represented her. For example, just one month after respondent had sent her the $93,000 check in April 1989, Ms. Roden called respondent to say she needed money. Respondent recalled that Ms. Roden had told him that she needed the cash either because her electricity was about to be shut off or because she was going

to be evicted from an apartment in Florida where she was living at the time. In response to Ms. Roden's request, respondent sent her $500 out of his business account.

In May 1991, when the Franceze matter was about to be tried, Ms. Roden expressed concern to respondent over how she was going to pay his fees for the litigation. Indeed, respondent had not received any fees for that matter since April 1990, and he was absorbing all of the trial-preparation expenses. In response to Ms. Roden's concerns in May 1991, respondent agreed to change his fee arrangement in the Franceze litigation to make it contingent on recovery. The contingent fee was based on an hourly rate of $150. Respondent informed Ms. Roden that the total fee for the Franceze matter from May 1991 through the end of the trial could easily reach $50,000.

The Franceze matter went to trial in September 1991. At the conclusion of the trial, the court reserved decision. In January 1992, the court awarded a $95,000 judgment in favor of Ms. Roden, and a $900,000 judgment in favor of a family trust, of which Ms. Roden was one of three beneficiaries. Because those judgments were not satisfied immediately, respondent did not collect his contingent fee before his involvement in the real-estate transaction that is the source of the present disciplinary proceedings. We now turn to the facts surrounding that transaction.

## A. The $6,000 Deposit

On February 3, 1992, Ms. Roden signed a contract for the sale of her house in Little Silver while being represented by respondent. The contract provided for a total purchase price of $192,000 and a deposit of $6,000 to be held in escrow "until closing of title." Although the contract provided that the deposit was to be held by the realtor, the deposit was in fact turned over to respondent. On February 5, 1992, respondent deposited that $6,000 check into his trust account.

On February 6, 7, and 13, 1992, respondent disbursed to himself the sums of $1,000, $3,000, and $2,000 from the $6,000 deposit. Respondent used that $6,000 for his own purposes.

Respondent testified that on February 6, 1992, he had learned that a termite inspection of Ms. Roden's house had revealed termite damage, and that the estimated amount of the repairs was $600. Respondent further testified that the required repairs had placed the sale of the house in jeopardy because neither Ms. Roden nor the buyers had had the money necessary to make those repairs. The contract limited Ms. Roden's obligation to $100 for repairs.

In an effort to salvage the transaction, respondent spoke with the attorney for the buyers on February 6, 1992. Respondent testified that during that conversation he and the buyers' attorney had come to an agreement that would "hold the contract together." Specifically, according to respondent, he and the buyers' attorney had agreed that the buyers would release the $6,000 deposit to Ms. Roden in exchange for Ms. Roden's agreeing to perform the necessary repair work on the house.

Respondent further testified that Ms. Roden had consented to his release of the $6,000 to his personal account to spend for his own purposes. Respondent stated that Ms. Roden had agreed they would treat the $6,000 as a loan.

### B. The $34,000 From The Closing Proceeds

On March 27, 1992, respondent handled the closing on Ms. Roden's house. Ms. Roden was not present. On March 31, 1992, respondent sent Ms. Roden a certified check written against his trust account in the amount of $124,671.57. That check was for $41,250 less than the amount to which Ms. Roden was entitled. In a handwritten note sent with the check, respondent explained the majority of the shortfall:

Babe,

I had the check certified so you won't have to wait for it to clear.

I have to borrow 40,000 for two weeks at 12%. I'll call you tomorrow.

Lee

The $40,000 loan noted by respondent consisted of the $6,000 deposit he had disbursed to himself in February 1992, and $34,000 he disbursed to himself out of the closing proceeds by two separate checks written from his trust account on March 31, 1992. The remaining $1,250 represents the alleged escrow account.

Respondent testified that he and Ms. Roden had discussed his borrowing from the closing proceeds prior to the closing. He stated:

I told her since I had agreed to make my fee [on the Franceze matter] contingent I needed to draw against funds, I needed to draw against the closing proceeds. And I said, however, since I had made my fee contingent I'll treat it as a loan. She asked how much I needed, I said it wouldn't be any more than what I have for the legal fees or what's approximately due me as the legal fees. We discussed what the number was, I said around fifty thousand dollars. I told her I'd pay her interest on the loan until we did collect. She was in effect delighted by that idea, she was finally going to be earning money on her money, in effect reducing my legal fees.

Prior to the closing I told her I was going to borrow forty thousand dollars against the closing proceeds. She said, fine.

In a telephone conversation on April 6, 1992, Ms. Roden and respondent discussed the repayment of the $40,000. Respondent told Ms. Roden that he was "working on" repaying the money, and Ms. Roden responded, "[F]ine." However, as of May 8, 1992, Ms. Roden still had not received the $40,000 and had not heard from respondent regarding the repayment. Thus, on May 8, 1992, she sent respondent the following handwritten note:

Dear Lee,

Having been in similar positions myself at times, I anticipate you have not yet procured a loan.

Extending the length of time to what ever is comfortable with you is no problem.

Please give me a call so we may discuss this.

Babe

In late May or early June 1992, not having received a satisfactory response to her note, Ms. Roden contacted Wopat, her former attorney. Ms. Roden retained Wopat in her efforts to secure the return of her $40,000 from respondent. In a letter to respondent dated June 5, 1992, Wopat demanded that respondent make

"prompt restitution" of the $40,000 taken out of Ms. Roden's closing proceeds. Wopat also warned respondent that he was not "under any circumstances" to attempt to contact Ms. Roden directly.

On June 12, 1992, Wopat and respondent had a telephone conversation wherein respondent agreed to repay the $40,000 by June 15, 1992. Wopat confirmed that agreement in a letter sent to respondent by facsimile that same day. On June 15, 1992, at 4:00 p.m., when Wopat had received neither the $40,000 nor any communication from respondent, he called the district ethics committee to report respondent's conduct.

Wopat also filed a civil suit against respondent in June 1992, seeking repayment of the $40,000, punitive damages, counsel fees, and costs. Respondent counterclaimed against Ms. Roden for payment of his outstanding fees, including the outstanding fees from the Franceze matter.

Ms. Roden turned over to Wopat the entire Franceze matter in which respondent's fee had not been paid because the substantial judgment had not been satisfied. Ms. Roden agreed to pay Wopat at a rate of $150 per hour, and Wopat agreed that Ms. Roden would not have to pay his fees until she had money "accessible" to her. In August 1993, Wopat settled the Franceze judgment for the approximate sum of $132,000. From that recovery, Ms. Roden paid Wopat approximately $14,000 in fees. Apparently, respondent received no portion of his fee from that settlement.

As of the date of the hearing before the district ethics committee, respondent had not repaid Ms. Roden the $40,000 taken out of the closing proceeds.

### C. The $1,250 "Escrow"

The $1,250 represents the remaining sum missing from Ms. Roden's check for the closing proceeds. Respondent testified that he and the buyers' attorney had agreed at the closing to hold that sum in escrow until respondent could secure a warrant to satisfy

judgment with respect to what had appeared in the title binder to be an outstanding judgment in the amount of $1,125 against Ms. Roden. Respondent further testified that although he had been certain by the time of closing that he had satisfied the judgment, he had not been able to secure proof that he had done so. Respondent noted that he and the buyers' attorney "didn't bother" to document the $1,250 escrow on the closing statement.

Respondent testified that he had discovered after the closing that he had in fact satisfied the judgment reflected in the title binder with a $1,125 check written on his business account. He also learned that he had written another $1,000 check out of his attorney trust account to satisfy sanctions imposed against Ms. Roden in the Franceze matter. He therefore kept the $1,250 escrow for himself as reimbursement. Notwithstanding his claim that he was entitled to the $1,250, on November 19, 1992, respondent forwarded to Wopat the sum of $1,250 by a check drawn on his business account with a transmittal letter that designated the check as "the closing proceeds discrepancy."

### III

*Wilson, supra,* defines misappropriation as "any unauthorized use by the lawyer of clients' funds entrusted to him, including not only stealing, but also unauthorized temporary use for the lawyer's own purpose, whether or not he derives any personal gain or benefit therefrom." 81 *N.J.* at 455 n. 1, 409 *A.*2d 1153. Since *Wilson,* the Court has made it clear that a necessary element of "knowing misappropriation" is that the attorney knew as of the time that he or she took the client's money that the attorney lacked the client's authorization to do so. A knowing misappropriation "consists simply of a lawyer taking a client's money entrusted to him, knowing that it is the client's money and knowing that the client has not authorized the taking." *In re Noonan,* 102 *N.J.* 157, 160, 506 *A.*2d 722 (1986). To find knowing misappropriation, the Court must be able to conclude by clear-

and-convincing evidence that the client did not consent to the attorney's use of the funds.' *In re Perez*, 104 *N.J.* 316, 324, 517 *A.*2d 123 (1986).

We recognize that the inflexible, unremitting nature of the *Wilson* rule can be harsh in its application. *In re Lennan*, 102 *N.J.* 518, 523, 509 *A.*2d 179 (1986). We are thus ever mindful of our duty to ensure that the *Wilson* rule of disbarment is not invoked absent absolute satisfaction of the Court that the evidence demonstrates clearly and convincingly that the attorney did in fact engage in knowing misappropriation. *See Perez, supra*, 104 *N.J.* at 324–25, 517 *A.*2d 123. As we have recognized in the past,

> "[t]his high standard [of proof] emphasizes the reluctance which should character-ize a decision to impose a disciplinary sanction and the serious consequences which attend such a decision. As a practical matter, such a decision limits, if it does not prelude, an attorney's opportunity to practice his chosen profession. We should impose such a restriction only after careful deliberation and only in circumstances which clearly warrant it."
>
> [*Ibid.* (quoting *In re Sears*, 71 *N.J.* 175, 197–98, 364 *A.*2d 777 (1976)).]

■ Based on our independent evaluation of the record, we are unable to conclude by clear-and-convincing evidence that respondent's conduct in borrowing the $6,000 deposit and the $34,000 from the closing proceeds under the unique facts recounted above falls within the purview of "knowing misappropriation" as that concept is understood in *Wilson, supra*, 81 *N.J.* at 453, 409 *A.*2d 1153, and its progeny. Specifically, we cannot conclude that the record demonstrates clearly and convincingly that respondent borrowed Ms. Roden's money while knowing that he lacked her authorization to do so. *Perez, supra*, 104 *N.J.* at 324, 517 *A.*2d 123; *Noonan, supra*, 102 *N.J.* at 160, 506 *A.*2d 722. Rather, we believe that based on the extraordinary and unique circumstances that characterized his nine years of financial dealings with Ms. Roden, respondent was justified in assuming that he had Ms. Roden's consent to borrow from the closing proceeds.

In reaching this result, we are swayed by the long-standing and exceedingly informal nature of respondent's professional relation-ship with Ms. Roden, especially concerning the payment of respondent's fees. We note that over the course of his nine-year

representation of Ms. Roden, respondent consistently received payment for his services pursuant to the extraordinarily informal and somewhat haphazard fee arrangement described above. That arrangement, which not only met with Ms. Roden's full approval but benefitted her as well, generated a pattern of practice whereby respondent most often secured payment for legal fees owed to him by Ms. Roden out of monetary distributions that he achieved for her. Each and every time that respondent secured his fees in this fashion, Ms. Roden gave her approval.

The borrowing of the $40,000, with only slight variation, was consistent with respondent's common practice of securing the fees owed to him out of accounts receivable he collected for Ms. Roden. We note specifically that the borrowing of the $40,000 was directly connected to respondent's anticipated $50,000 fee from the Franceze litigation, which he was on the verge of recovering as of the time that he borrowed from the closing proceeds. We find that in light of Ms. Roden's consistent practice of permitting respondent to disburse sums of money to himself out of monies to be turned over to her, respondent reasonably could have assumed that he had Ms. Roden's authorization to borrow the $40,000 against his anticipated fees in the Franceze litigation. We are therefore unable to conclude by clear-and-convincing evidence, with respect to either the $34,000 from the closing proceeds or the $6,000 deposit, that respondent knew he lacked Ms. Roden's consent to borrow the money.

Indeed, Ms. Roden's May 8, 1992, letter extending the time for respondent to repay the $40,000 supports the conclusion that respondent reasonably believed, based on his long-standing relationship with Ms. Roden, that he had her consent to take a loan out of the closing proceeds. That letter demonstrates that shortly after respondent had disbursed to himself the $34,000 from the closing proceeds, Ms. Roden had absolutely no objection to treating that transaction, along with respondent's use of the $6,000 deposit, as a loan. Thus, although a client's subsequent ratification clearly cannot legitimize a prior knowing misappropriation by

the attorney, *see Lennan, supra,* 102 *N.J.* at 524, 509 *A.*2d 179, Ms. Roden's May 8th letter provides evidential support for the conclusion that respondent reasonably could have believed that he had his client's implied consent to draw from the closing proceeds.

We find no basis for the distinction drawn by the DRB between respondent's conduct with respect to the $34,000 from the closing proceeds and his conduct with respect to the $6,000 deposit. Because the record supports the conclusion that the unique circumstances surrounding respondent's relationship with Ms. Roden render it plausible that Ms. Roden agreed to lend respondent the $34,000 from the closing proceeds, the same conclusion must be reached with respect to the $6,000 deposit. Contrary to the reasoning of the DRB, respondent's failure to obtain the consent of the buyers' attorney to use the deposit money for his own purposes is irrelevant. Once it is accepted that the buyers agreed to release the deposit to Ms. Roden, the only relevant inquiry into the propriety of respondent's conduct is whether Ms. Roden personally gave authorization to use the deposit money for respondent's own purposes. Respondent was not charged with violating an escrow agreement.

After carefully studying the record, mindful of our obligation to make independent findings of fact, we cannot conclude by clear-and-convincing evidence that respondent borrowed either the $6,000 deposit or the $34,000 from the closing proceeds while "knowing that [he] ha[d] no authority to do so." *Noonan, supra,* 102 *N.J.* at 160, 506 *A.*2d 722. Accordingly, we find that respondent's conduct does not qualify as "knowing misappropriation" under *Wilson, supra,* 81 *N.J.* at 453, 409 *A.*2d 1153. Thus disbarment is not justifiable.

We emphasize that the decision announced today is predicated solely on the unique factual circumstances surrounding this case. The decision indicates only that based on the peculiar facts before us, we are unable to conclude by the demanding standard of clear-and-convincing evidence that respondent "knowingly" misappropriated his client's funds.

Most important, we caution in the strongest terms possible that other members of the Bar should not view this decision as indicating approval of respondent's conduct. Indeed, we cannot emphasize enough the severity with which we disapprove of respondent's informal and careless professional practices. As demonstrated by this case, such careless practices can only result in a waning of attention to the dictates of the ethical rules, and attorneys who engage in such practices run the substantial risk of disciplinary sanctions.

## IV

Based on our independent review of the record, we are satisfied by clear-and-convincing evidence that respondent violated *RPC* 1.8, *Rule* 1:21-6, and *RPC* 1.15(d). We find that those violations warrant a six-month suspension of respondent's license to practice law in New Jersey.

Briefly, we must reiterate that we find intolerable the type of loose and informal billing practices such as those used by respondent during his representation of Ms. Roden. An attorney's billing of a client without documentation regarding the amount of time spent in representing that client is entirely unacceptable. *See generally R.* 1:21-6. Billing a client without providing the client with a written statement documenting the amount billed is equally unacceptable. *R.* 1:21-6(b)(5).

In addition, we note that respondent's violation of *RPC* 1.8 could not be more clear-cut. First, the plain language of that rule clearly requires an attorney who takes a loan from his or her client to advise that client of the desirability of seeking independent counsel prior to entering into the transaction. *RPC* 1.8(a)(2). Secondly, *RPC* 1.8(a)(1) requires the terms of any loan transaction between an attorney and his or her client to be set forth in a written document provided to the client. Although respondent's failure to abide by those rules was almost certainly a by-product of his informal and long-standing relationship with Ms. Roden, that relationship cannot in any way justify respondent's loose approach

to his clear ethical obligations. Indeed, this type of case—where the client has complete faith and trust in his or her attorney of many years—demonstrates the critical importance of the attorney's apprising the client of the benefit of having a neutral attorney assess the fairness of the proposed transaction.

Based on respondent's violations of *RPC* 1.8, *Rule* 1:21–6, and *RPC* 1.15(d), we suspend respondent from the practice of law in New Jersey for a period of six months.

Respondent shall reimburse the Disciplinary Oversight Committee for appropriate administrative costs.

*For suspension*—Chief Justice WILENTZ and Justices HANDLER, POLLOCK, GARIBALDI, STEIN and COLEMAN—6.

*Opposed*—None.

## ORDER

It is ORDERED that **LEE W. SHELLY** of **MANASQUAN,** who was admitted to the bar of this State in 1973, is hereby suspended from the practice of law for a period of six months effective July 1, 1995, and until the further Order of the Court; and it is further

ORDERED that respondent be restrained and enjoined from practicing law during the period of his suspension and that he comply with *Rule* 1:20–20, which governs suspended attorneys; and it is further

ORDERED that respondent reimburse the Disciplinary Oversight Committee for appropriate administrative costs incurred in the prosecution of this matter.