203 N.J. Super. 69 (1984)
495 A.2d 915
STATE OF NEW JERSEY, PLAINTIFF,
v.
JAMES A. D'AGOSTINO, DEFENDANT.
Superior Court of New Jersey, Law Division Somerset County.
Decided November 21, 1984.
*71 Nicholas L. Bissell, Jr., Prosecutor of Somerset Cty., Lisa Fittipaldi, Legal Assistant appearing for the State.
John D. Murray appearing for defendant.

OPINION
IMBRIANI, J.S.C.
Does proof of driving a motor vehicle with a blood alcohol concentration of .10% or more, without any other evidence, compel a conviction under N.J.S.A. 39:4-50(a)? And if so, is the statute constitutional?
N.J.S.A. 39:4-50(a), as amended April 7, 1983, proscribes "... operat[ing] a motor vehicle while under the influence of intoxicating liquor ... or ... with a blood alcohol concentration of 0.10% or more by weight of alcohol in the defendant's blood ..." [emphasis added.] The statute proscribes two distinctly different offenses. One is the long standing offense of driving a motor vehicle while under the influence of alcohol, and the other is the new offense of driving a motor vehicle with a blood alcohol concentration of .10% or more.
This appeal stems from an incident that arose on the night of October 11-12, 1983. After consuming one glass of wine at dinner, the defendant stopped at the Bedminster Inn where he had either two or three drinks of brandy on the rocks. He left the Inn at about 12:35 a.m., proceeded north on Route 202, and swerved when passing a police vehicle traveling in the opposite lane. The police officer followed the defendant, noted his vehicle drifting from side to side, albeit always in his lane, and based upon his observations stopped the defendant. The officer smelled alcohol so he administered psychophysical tests, which resulted in the defendant being arrested and brought to police headquarters, where psychophysical tests were re-administered and at about 1:40 a.m. two breathalyzer tests were given, one registering .18% and the other .19% of blood alcohol. Defendant was convicted in the municipal court of operating a *72 motor vehicle with a blood alcohol concentration in excess of 0.10%. This appeal is de novo on the record, except for videotapes of the tests performed at police headquarters which were personally examined by this court.
The necessity for stringent drunk driving laws has received widespread and nearly unanimous support in an increasing crescendo in the last several decades throughout this nation. "The increasing slaughter on our highways, most of which should be avoidable, now reaches the astounding figures only heard of on the battlefield", Breithaupt v. Abram, 353 U.S. 432, 439, 77 S.Ct. 408, 412, 1 L.Ed.2d 448 (1975), and "exceeds the death total of all our wars". Perez v. Campbell, 402 U.S. 637, 658, 91 S.Ct. 1704, 1715, 29 L.Ed.2d 233 (1971) (Blackmun J., concurring). As noted by Chief Justice Burger in Mackey v. Montrym, 443 U.S. 1, 18, 99 S.Ct. 2612, 2621, 61 L.Ed.2d 231 (1979), traffic deaths in the United States commonly exceed 50,000 annually and approximately one-half of these fatalities are alcohol related. Drastic remedies were necessary to reduce the senseless carnage on our highways.
The new language of N.J.S.A. 39:4-50(a) could hardly be more lucid. No longer does a reading of .10% or more merely create, as in the past, a rebuttable presumption that a driver was under the influence of alcohol; it now constitutes a criminal offense. In unvarnished language the statute "contains no presumption but, rather, an outright ban on driving with a .10% BAC." Fuenning v. Super. Ct. In & For Cty. of Maricopa, 139 Ariz. 590, 680 P.2d 121, 126 (1983). "[T]he statute does not presume, it defines" and "is an [alternative] method of committing the crime of driving while under the influence" of alcohol. State v. Franco, 96 Wash.2d 816, 639 P.2d 1320, 1323 and 1325 (1982). The April 7, 1983 release of Governor Kean announcing his signing of the bill creating the new offense said, "[t]his bill removes the presumption of intoxication and makes it a crime to have [a.10%] level of blood alcohol."
*73 Thus, under the 1983 Amendment, the issue no longer is whether the defendant was drunk. Or whether he was under the influence of alcohol. Or whether his driving ability was impaired in any fashion. Rather the sole and rather simple issue is whether he operated a motor vehicle with a blood alcohol concentration of.10% or more. If he did, he is guilty, no matter how the alcohol affected him personally. Neither other evidence nor opinions of intoxications are necessary to convict.
The purpose of the statute is not to relieve the State of its burden to prove the defendant's guilt beyond a reasonable doubt or to shift to the defendant the burden to prove his innocence. It:
... simply removes the necessity of providing an expert at each trial to testify to the effect of that percentage of alcohol upon the defendant's ability to drive. [State v. Ball, 264 S.E.2d 844, 846 (W. Va. 1980).]
The intent of the statute being plain, is it constitutional? The defendant contends that a statute which creates a standard of conduct that the average person does not know he is violating is void for vagueness because it denies him due process of law under the 14th Amendment. He argues that a person of ordinary intelligence does not know when his blood alcohol concentration is .10% or more and, thus, he could be convicted of a crime without knowing that he was violating the law. It is basic that "an enactment is void for vagueness if its prohibitions are not clearly defined" because "laws [must] give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly". Grayned v. City of Rockford, 408 U.S. 104, 109, 92 S.Ct. 2294, 2298, 2299, 33 L.Ed.2d 222 (1972).
Actually the defendant's complaint is not that the statute is vague and uncertain (what could be more precise than a standard that requires a scientific measurement?), but rather that it is too precise and exact for the ordinary person to appreciate when he is violating the statute. How, he asks, would a person know if his blood alcohol concentration was a permissible .099%, *74 or an illegal .10%? The question is rhetorical because even under the former law one could ask how would a person know when his blood alcohol concentration was .10% or more and created a presumption of guilt? The simple truth is that the law imposes on those who drink and drive the obligation to make certain that they do not violate the statute. An obvious virtue of the amendment is its simplicity. It provides both a clear guideline for all to comprehend and a facile, yet precise, standard to determine if the law has been violated. As stated in Greaves v. State, 528 P.2d 805, 808 (Utah 1974):
[w]e can see no reason why a person of ordinary intelligence would have any difficulty in understanding that if he has drunk anything containing alcohol, and particularly any substantial amount thereof, he should not attempt to drive or take control of a motor vehicle.
Nor can it be said that the rights and privileges of our citizens are abridged or impaired by the statute.
It does not prohibit driving. It does not prohibit drinking. It prohibits drinking and driving. We know of no constitutional right to drink and drive... If, therefore, this statute inhibits and "chills" the mixture of alcohol and gasoline, it will fulfill the precise objective sought by the legislature. [Fuenning v. Super. Ct. In & For Cty. of Maricopa, supra, 680 P.2d at 128; emphasis supplied.]
The defendant challenges the premise that there is a rational basis for the determination that a driver of a motor vehicle with a blood alcohol concentration of .10% or more is dangerous to others on the highways. He asserts that if the statutory level of.10% is valid, the Legislature could reduce the offense to a .05% concentration, or even an absurd .01%. Indeed, the dissent in Greaves argued that the statute does not prohibit criminal conduct but only deals with the content of one's blood and, if upheld:
... the legislature could denounce as a crime the appearance in a public place of one who has the virus of a common cold in his blood stream. [Greaves, supra, 528 P.2d at 808]
But what defendant fails to appreciate is that the statute does not make it a criminal offense to simply have foreign material in one's blood; what is proscribed is conduct that is dangerous *75 to others, i.e., driving a motor vehicle while having a certain amount of alcohol in one's blood.
The critical issue is whether there is a rational basis upon which the Legislature fairly and reasonably concluded that a driver with a blood alcohol concentration of .10% or more constitutes a danger to others on the roadway. Clearly the statute enunciates a legislative determination that it is dangerous for a person with a blood alcohol concentration of .10% or more to operate a motor vehicle.
A review of the New Jersey Senate and Assembly statements attached to the bill sheds little light on its purpose other than to note the amount of federal grants available when a state adopts stringent drunk driving laws. However, several cases in sister states lucidly articulate the reasons for a .10% standard.
State v. Franco, supra, wrote of an issue paper published by the U.S. Department of Transportation in February 1969, entitled "Alcohol Countermeasures Illegal Per Se and Preliminary Breath Testing," which concluded that:
... there is an abundance of scientific support to indicate that with a BAC of 0.1 percent, all persons are significantly affected. At that level, all persons will have lost one quarter of their normal driving ability, some persons will have lost as much as one half of their normal driving ability and a few people will not be able to even sit up in the driver's seat. [Id. 639 P.2d at 1322; emphasis supplied.]
See also Commw. v. Mikulan, 504 Pa. 244, 470 A.2d 1339 (1983); Coxe v. State, 281 A.2d 606 (Del. 1971); and State v. Vannata, 8 Ohio Misc.2d 22, 456 N.E.2d 1358, 1361 (Ohio Mun.Ct. 1983). Fuenning v. Super. Ct. In & For Cty. of Maricopa, supra, in which the court said:
[i]t seems to be the general consensus of scientific thought that almost every driver will experience significant impairment of driving ability at a BAC level of .05% to .08%. Thus, in declaring driving or control of a vehicle illegal at .10% the legislature has proscribed driving at a level where virtually every driver would be a danger to the public. [Id. 680 P.2d at 126; emphasis supplied.]
It will be said, but there is no proof that all drivers will have either their physical or mental faculties impaired when their blood alcohol concentration is .10% or more. Indeed, many will *76 tell of the friend they know who can drink non-stop and never display any visible indicia of being impaired or under the influence of alcohol. Is it fair, they ask, to convict those persons by adopting a "per se" standard merely to enable the State to more easily apprehend the others?
Assuming there are such exceptional persons (and there are no studies to support this claim), what the defendant fails to appreciate is that the amended statute enunciates a legislative determination that every driver of a motor vehicle with a blood alcohol concentration of .10% or more, including those who do not exhibit any visible indicia of intoxication, constitutes a danger to others. Patently the Legislature concluded that simply because a driver does not visibly display any indicia of intoxication does not mean that he can adequately control his motor vehicle. A person may well be able to walk a straight line, speak coherently, not exhibit bloodshot eyes or a flushed face and, yet, still lack what it takes to safely drive a motor vehicle. What the studies have shown is that all or substantially all drivers with a blood alcohol concentration of .10% or more have diminished judgment, self-control and reflexes that cause them to become a safety risk in that when operating a motor vehicle they either take chances they would normally avoid or cannot maintain proper control of their vehicle. It is clear that the Legislature determined that the danger to the public is so serious and acute that all must comply. And the state is vested, by virtue of its police power, with a large measure of discretion in the creation and definition of criminal offenses subject, of course, to the constitutional restraints that it act fairly and reasonably. Accordingly, "the Legislature has the power and the right to designate the mere doing of an act as a crime, even in the absence of the mens rea, which was a necessary prerequisite at common law". Morss v. Forbes, 24 N.J. 341, 358 (1957).
Many state Supreme Courts throughout the nation have already sustained similar statutes. And while the United States Supreme Court has not directly reviewed any of those *77 cases, it did recently deny certiorari in a case involving an almost identical statute in California. Burg v. Mun. Ct. for Santa Clara Jud. Dist., 35 Cal.3d 257, 198 Cal. Rptr. 145, 673 P.2d 732 (1983), cert. den., ___ U.S. ___, 104 S.Ct. 2337, 80 L.Ed.2d 812 (1984). Admittedly, the denial of certiorari does not signify or constitute a determination on the merits, United States v. Shubert, 348 U.S. 222, 75 S.Ct. 277, 99 L.Ed. 269 (1955), but the result is that a multitude of .10% statutes throughout the several states will be enforced. The great weight of authority clearly holds, as does this court, that the statute is constitutional.
This being so, is extrinsic evidence of sobriety, as may be indicated by the results of psychophysical tests or by viewing the behavior of the defendant on a videotape, admissible and relevant when a defendant has been charged with having a blood alcohol concentration of .10% or more? We think it is.
It remains the obligation of the State to prove beyond a reasonable doubt what was the blood alcohol concentration of the defendant at the time he was driving. And since the breathalyzer and other scientific tests are performed some period of time after the driving has been completed, there will always arise the problem of extrapolating the results of the scientific tests to an earlier time to determine the condition of the defendant at the time he was operating a motor vehicle. Moreover, testing procedures always contain a margin of error and when, as here, the defendant challenges the qualifications of the person performing the tests and the proper administration of the tests, the psychophysical tests' results and viewing of the videotape may well bear on the validity of the test results.
In this case the performance of the defendant of psychophysical tests and his behavior as shown on the videotape suggested that the defendant was not then under the influence of alcohol. He asserts this should create a doubt as to the validity of the breathalyzer test results. If this was a case where the blood alcohol readings were .10% or .11%, such *78 evidence might create some doubt as to either the accuracy of the machine or the proper administration of the tests. But such is not the situation here. The breathalyzer was in proper working condition, the tests were properly administered and the blood alcohol readings were a very high .18% and .19%. Under these circumstances the extrinsic evidence does not create any doubt in the mind of this court that the defendant's blood alcohol concentration was .10% or more at the time he was operating a motor vehicle on our public highways and that the State has proven his guilt beyond a reasonable doubt.