STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. JOHN E. TISCHIO, DEFENDANT-APPELLANT.

Argued November 5, 1986—Decided June 30, 1987.

*Robert B. Gigl, Jr.,* argued the cause for appellant (*Stein, Bliablias, McGuire & Pantages,* attorneys).

*Simon Louis Rosenbach,* Assistant Prosecutor, argued the cause for respondent (*Alan A. Rockoff,* Middlesex County Prosecutor, attorney).

*Boris Moczula,* Deputy Attorney General, argued the cause for *amicus curiae* Attorney General of New Jersey (*W. Cary Edwards,* Attorney General, attorney).

The opinion of the Court was delivered by

HANDLER, J.

This appeal requires the Court to interpret *N.J.S.A.* 39:4–50(a). This statute makes it unlawful for a person to operate "a motor vehicle ... with a blood alcohol concentration of 0.10% or more by weight of alcohol in the [person's] blood." Specifically, we must decide whether, under the statute, a blood-alcohol level of at least 0.10%, determined solely by a breathalyzer test that is administered within a reasonable time after a defendant's arrest for drunk driving, satisfies the statute; or whether extrapolation evidence, which uses the results of such a breathalyzer test to demonstrate the blood-alcohol level at the time defendant was actually driving, is either required or permitted to establish the statutory offense. Restated, the issue is whether it is the blood-alcohol level at the time of the breathalyzer test or at the time of the operation of the motor vehicle that is essential in establishing the statutory offense.

 We now hold that a defendant may be convicted under *N.J.S.A.* 39:4–50(a) when a breathalyzer test that is administered within a reasonable time after the defendant was actually driving his vehicle reveals a blood-alcohol level of at least 0.10%. We rule that it is the blood-alcohol level at the time of the breathalyzer test that constitutes the essential evidence of the offense. Consequently, we hold further that extrapolation evidence is not probative of this statutory offense and hence is not admissible. Accordingly, we affirm the judgment of the Appellate Division.

I.

The facts that give rise to this appeal are not disputed. On April 11, 1984, at approximately 8:15 p.m., defendant, John

Tischio, was stopped by Officer DeAmoria of the Metuchen Police Department for allegedly operating his automobile in an erratic manner. After DeAmoria smelled alcohol on defendant's breath and observed defendant sway and stagger, he placed defendant under arrest for driving while under the influence of intoxicating liquor, in violation of *N.J.S.A.* 39:4–50(a). At the time of his arrest, defendant admitted that he had drunk three or four beers prior to operating the automobile.

Defendant was then taken to police headquarters where he underwent certain balancing tests. The results of these tests were largely inconclusive. At approximately 9:15, one hour after defendant was stopped, defendant was administered a breathalyzer test. A second test was conducted at approximately 9:24. The result of each test was a blood-alcohol reading of .11%.

The matter was tried in the Metuchen Municipal Court on November 2, 1984. The State's case consisted of Officer DeAmoria's testimony and the results of the breathalyzer tests. At the close of the State's evidence, defendant moved for a judgment of acquittal, asserting that the State had failed to produce any evidence as to his blood-alcohol level at the time he was actually driving. The Municipal Court denied defendant's motion. Defendant then presented expert testimony to the effect that if his blood-alcohol level was .11% at 9:15 and 9:24 then, at the time of the stop, his blood-alcohol level was only .07%.

The Municipal Court concluded that, based upon the physical evidence, it had a substantial doubt as to defendant's guilt of driving while under the influence, the alternative standard for conviction under *N.J.S.A.* 39:4–50(a). However, it found defendant guilty of driving with a blood-alcohol concentration of .10% or more, contrary to *N.J.S.A.* 39:4–50(a). Thereafter, a trial *de novo* was held in the Superior Court, Law Division, Middlesex County. That court also concluded that defendant

was guilty of driving with a blood-alcohol level of .10% or more in violation of *N.J.S.A.* 39:4–50(a).

Defendant then filed an appeal with the Appellate Division. Defendant reiterated his assertion that he was entitled to an acquittal because the State had failed to prove that his blood-alcohol concentration was .10% or more at the time he was actually operating his vehicle. The Appellate Division held that *N.J.S.A.* 39:4–50(a) is violated when the administration of a breathalyzer test "produces a reading of .10 percent blood alcohol or greater *at any time* after operation [of a motor vehicle] so long as there has been no ingestion of alcohol between the time of operation and the time of testing." *State v. Tischio*, 208 *N.J.Super.* 343, 347 (App.Div.1986) (emphasis added). Consequently, the court affirmed the conviction, ruling that expert testimony extrapolating the test results to demonstrate a lower blood-alcohol level at the time of actual driving is irrelevant.

On June 3, 1986, we denied defendant's petition for certification. Defendant moved for reconsideration of this denial and, on August 5, 1986, this motion was granted. 105 *N.J.* 518.

II.

In this case, both parties have assumed that the relevant time for determining defendant's blood-alcohol level, under *N.J.S.A.* 39:4–50(a), is at the time he was actually operating the motor vehicle. Consequently, the litigation focused upon who—the State or the defendant—had the burden of relating breathalyzer test results back to the time when defendant was operating his vehicle. On this issue, the Appellate Division rejected defendant's contention that the State, as part of its case in chief, must produce extrapolation evidence. The court held:

[W]e do not accept defendant's premise that the State, after obtaining a breathalyzer reading of .10 percent or greater, must demonstrate through clear scientific evidence or expert testimony that the blood alcohol level was greater

than .10 percent at the exact time of operation of the vehicle. [*Tischio, supra,* 208 *N.J.Super.* at 347.]

However, the court went further and held:

The statute [*N.J.S.A.* 39:4–50(a)] reflects a simple legislative plan to establish a violation where the administration of the breathalyzer or other established tests for determining blood alcohol content produces a reading of .10 percent blood alcohol or greater *at any time* after operation so long as there has been no ingestion of alcohol between the time of operation and the time of testing. Further proof on the issue of the blood alcohol level at the time of operation is unnecessary. [*Id.* (emphasis added.)]

Defendant's contention that *N.J.S.A.* 39:4–50(a) permits the introduction of extrapolation evidence is based on the premise that the statute clearly and unambiguously prohibits a .10% blood-alcohol concentration only at the time of operation. Defendant relies on *State v. Allen,* 212 *N.J.Super.* 276, 282 (Law Div.1986), where the trial court adopted this position, stating that the statutory language "leaves little room for interpretation."

The statute states in relevant part:

A person who operates a motor vehicle while under the influence of intoxicating liquor ... or operates a motor vehicle with a blood alcohol concentration of 0.10% or more by weight of alcohol in the defendant's blood ... shall be subject [to penalties.]

This language literally defines the offense as involving two necessary elements—a prohibited blood-alcohol level and the operation of a motor vehicle—and seemingly requires that both occur together. While the coincidence of the two statutory elements arguably is required to establish the offense, other considerations militate against such an interpretation. These include the fact that the statute is not plain and unambiguous on its face, that the legislative intent and purpose are contrary to such an interpretation, that the overall legislative scheme for the enforcement of drunk-driving laws would be impeded by such an interpretation, that the history of the legislation directs us to a different interpretation, and that overriding considerations of public policy would be disserved by such an interpretation.

We first examine whether *N.J.S.A.* 39:4–50(a) is plain and unambiguous on its face; or, to state the issue another way,

whether the statute is susceptible of application according to its literal terms.

A moment's reflection indicates that the statute is not unambiguous and that it cannot be applied literally. The statute expressly contemplates the administration of a breathalyzer test to determine blood-alcohol concentration. Indeed, the determination of blood-alcohol levels through chemical or breathalyzer tests is the linchpin of New Jersey's drunk-driving statutes. *See Romano v. Kimmelman*, 96 *N.J.* 66 (1984). Although the statute does not refer to the time of testing, it is obvious that a breathalyzer test cannot be administered while a defendant is driving his motor vehicle. Thus, the blood-alcohol level determined by a breathalyzer test can never automatically coincide with the time of the defendant's actual operation of his motor vehicle, as suggested by the literal language of the statute. This raises at least two possible interpretations of the statutory offense. One is that a .10% blood-alcohol level determined by a breathalyzer test made within a reasonable time of defendant's operation alone satisfies the statute. The other is that some evidentiary process—not discernible on the face of the statute—must be invoked to relate breathalyzer test results to the time when the defendant was actually driving.[1] The question is which interpretation comports with the true meaning of the statute.

It is settled that the most important factor in construing a statute is the intent of the Legislature. *Perez v. Pantasote, Inc.*, 95 *N.J.* 105, 114 (1984). We have consistently stated that:

---

[1] Notwithstanding his protestations to the contrary, *post* at 525, our dissenting colleague apparently agrees that *N.J.S.A.* 39:4–50(a) requires interpretation. The dissent rejects defendant's contention that the State has the burden of extrapolating breathalyzer test results to the time of actual operation, and would hold that such results represent the "presumptive equivalent" of a defendant's blood-alcohol concentration at the time he was driving. *Id.* at 532. This holding obviously requires a construction of the statute that goes beyond its "plain and unambiguous" language.

> In reading and interpreting a statute, primary regard must be given to the fundamental purpose for which the legislation was enacted. Where a literal rendering will lead to a result not in accord with the essential purpose and design of the act, the spirit of the law will control the letter. This doctrine permeates our case law. [*N.J. Builders, Owners and Managers Association v. Blair,* 60 *N.J.* 330, 338 (1972).]

*See also Wollen v. Borough of Fort Lee,* 27 *N.J.* 408, 418 (1958) ("The inquiry in the final analysis is the true intention of the law; and, to this end, the particular words are to be made responsive to the essential principle of the law. It is not the words but the internal sense of the law that controls."). We are mindful of the fact that *N.J.S.A.* 39:4–50(a) is penal in nature and, therefore, should be strictly construed. *State v. Grant,* 196 *N.J.Super.* 470, 480–81 (App.Div.1984). Nevertheless, even when dealing with a criminal statute, "the goal of the interpretive process is to ascertain the intent of the legislature. 'All rules of construction are subordinate to that obvious proposition.'" *Id.* at 481 (quoting *State v. Provenzano,* 34 *N.J.* 318, 322 (1961)). Thus, "the words of [a penal statute] are to be accorded a rational meaning in harmony with the obvious intent and purpose of the law." *State v. Brown,* 22 *N.J.* 405, 415 (1956).

A compelling parallel to this case, illustrating how criminal laws must be construed to effectuate legislative intent, can be found in the Court's interpretation of New Jersey's criminal statutes involving the use of guns, particularly our treatment of the Graves Act, *N.J.S.A.* 2C:43–6(c). The Graves Act provides that anyone who uses or possesses a firearm while committing, attempting to commit, or fleeing after the commission of certain designated crimes shall be sentenced to prison for a mandatory minimum term prescribed by the Act. In *State v. Des Marets,* 92 *N.J.* 62 (1983), we held, *inter alia,* that the "possession" of a firearm, for purposes of the Act, need not be possession with intent to use. *Id.* at 65. We have also held that "possession" of a firearm includes constructive possession, *State v. Stewart,* 96 *N.J.* 596, 604 (1984), and that the "firearm" involved in a Graves Act offense need not be proven operational

in order for the Act's sanctions to apply. *State v. Gantt*, 101 *N.J.* 573, 577 (1986). Finally, we have ruled that an accomplice who is convicted only of an unarmed offense is subject to Graves Act penalties if he knew a weapon would be used in the commission of the crime. *State v. White*, 98 *N.J.* 122, 126 (1984).

The point of these cases is our recognition that the intent and purpose of the Legislature, the "special objectives" of the Graves Act, mandated that we go beyond the literal language of the statute. *Id.* at 131–32. We realized that, notwithstanding the penal nature of the statute, a strict or literal interpretation was not consistent with the legislative goal. *State v. Des Marets, supra*, 92 *N.J.* 62. We are similarly enjoined to give our drunk-driving statutes the pragmatic and flexible interpretations necessary to effectuate the Legislature's regulatory aims, while honoring the due process limitations necessarily attendant upon the law's penal sanctions.

The primary purpose behind New Jersey's drunk-driving statutes is to curb the senseless havoc and destruction caused by intoxicated drivers. In *State v. D'Agostino*, 203 *N.J.Super*, 69, 72 (Law Div.1984), the court stated:

> The necessity for stringent drunk driving laws has received widespread and nearly unanimous support in an increasing crescendo in the last several decades throughout this nation. "The increasing slaughter on our highways, most of which should be avoidable, now reaches the astounding figures only heard of on the battlefield," and "exceeds the death total of all our wars".... [T]raffic deaths in the United States commonly exceed 50,000 annually and approximately one-half of these fatalities are alcohol related. Drastic remedies were necessary to reduce the senseless carnage on our highways. (citations omitted).

*See also State v. Johnson*, 42 *N.J.* 146, 165 (1964) (Noting "the common knowledge that a great number of serious accidents have involved drinking drivers—a fact which becomes of greater importance and public concern almost daily in this motor age with ever increasing vehicle speeds, the constantly growing number of vehicles on the roads and the staggeringly mounting accident toll."); *State v. Grant, supra*, 196 *N.J.Super.* at 476

("[W]e are dealing with law enforcement efforts designed to curb one of the chief instrumentalities of human catastrophe, the drunk driver.")

Our courts have not hesitated to give a broad construction to the terms of *N.J.S.A.* 39:4–50(a) when a narrow or literal interpretation would frustrate the fundamental regulatory goals underlying New Jersey's drunk-driving laws. For example, with respect to the most pivotal phrase of the statute—"operates a motor vehicle"—the courts of this State have consistently adopted a practical and broad interpretation of this language in order to express fully the meaning of the statute. A pragmatic definition of this term is necessary in order to effectuate the legislative intent to deal with the risk that intoxicated drivers will cause harm to themselves and to others who use the roadways of this State, a danger that frequently arises even before an intoxicated person may have put his or her car in motion. Thus, while the statute refers to the operation of a motor vehicle, actual operation is not required to satisfy this element of the statutory offense. *See State v. Sweeney,* 40 *N.J.* 359, 360–61 (1963) (a person may be "operating" a motor vehicle, within the meaning of *N.J.S.A.* 39:4–50(a), even when the vehicle has not been moved). We have consistently ruled that a defendant's intent to operate a motor vehicle can constitute "operation" within the meaning of the statute. *See, e.g., State v. Sweeney, supra,* 40 *N.J.* 359; *State v. Stiene,* 203 *N.J.Super.* 275, 279 (App.Div.1985); *State v. Prociuk,* 145 *N.J.Super.* 570, 574 (1976). The vigor of this interpretative theme is exemplified in our most recent decision, rendered this term, *State v. Mulcahy,* 107 *N.J.* 467 (1987). There, the Court once again applied a pragmatic understanding of "operating a motor vehicle" consistent with the underlying legislative purpose. We ruled that the apparently intoxicated defendant's attempt to put his key into the automobile ignition constituted operation of a motor vehicle within the meaning of the drunk-

driving statutes.[2] We are thus strongly impelled to construe
the terms of *N.J.S.A.* 39:4–50(a) flexibly, pragmatically and
purposefully to effectuate the legislative goals of the drunk-
driving laws.

In construing *N.J.S.A.* 39:4–50(a), we must also consider the
entire gamut of statutory and regulatory law dealing with the
societal dilemma of drunk-driving. This examination reflects
the traditional interpretative guide to construe the terms of a
statute in context, in *pari materia. State v. Brown,* 22 *N.J.*
405, 415 (1956). The overall scheme of these laws reflects the
dominant legislative purpose to eliminate intoxicated drivers
from the roadways of this State. To this end, the Legislature,
working in tandem with the courts, has consistently sought to
streamline the implementation of these laws and to remove the
obstacles impeding the efficient and successful prosecution of
those who drink and drive. One such impediment has been the
introduction of conflicting expert testimony at trials under
*N.J.S.A.* 39:4–50(a). *See State v. Johnson, supra,* 42 *N.J.* at
167. The vast majority of statutory revisions in this area have
been directed towards minimizing, if not eliminating, the necessi-
ty for this kind of evidence.

As originally enacted, *N.J.S.A.* 39:4–50(a) provided only that:

A person who operates a motor vehicle while under the influence of intoxicating
liquor ... shall be subject [to penalties.]

However, it was soon evident that the uncertain criterion of
operating "under the influence of intoxicating liquor" presented
substantial enforcement difficulties. As we said in *State v.
Johnson, supra,* 42 *N.J.* at 167:

---

[2] In another case decided this term, *State v. Wright,* 107 *N.J.* 488 (1987), we
held that a defendant may be convicted under *N.J.S.A.* 39:4–50.4a for refusing
to submit to a breathalyzer test absent proof that he was actually operating a
motor vehicle at the time of his arrest. We ruled that the State must prove
only that the arresting officer had probable cause to believe that the defendant
had been operating a vehicle while under the influence of alcohol. In arriving
at this conclusion, the Court focused on the "fundamental policies underlying
our drunk driving laws." *Id.* at 494.

What was needed to properly and fairly protect against the drinking driver was a test which could be easily and promptly administered by law enforcement officials and would, with sufficient accuracy, establish the amount of alcohol in the subject's system and a measurement criterion which would scientifically establish "under the influence" for purposes of the motor vehicle operation statute.

Thus, in 1951 the Legislature enacted *N.J.S.A.* 39:4–50.1 which provided that, in any prosecution under *N.J.S.A.* 39:4–50(a), a .15% blood-alcohol level would give rise to a presumption that the defendant was intoxicated.[3]

The primary purpose of *N.J.S.A.* 39:4–50.1 was to eliminate the necessity for expert and other testimony relating to the existence and degree of intoxication. As the court stated in *State v. Protokowicz*, 55 *N.J.Super.* 598, 609 (App.Div.1959):

The purpose of *N.J.S.A.* 39:4–50.1 is to dispense with the necessity for expert testimony that one with .15% of alcohol in the blood is under the influence of alcohol and to preclude testimony that persons with that much alcohol in the blood are not as a general rule under the influence of alcohol.

*See also State v. Johnson, supra,* 42 *N.J.* at 173 ("The presumption is not conclusive. . . . [b]ut, as a practical factual matter, it is exceedingly strong. . . . It is safe to say that such a reading is most difficult to overcome.").

Although New Jersey was, at this time, among the most stringent states in the nation in imposing penalties for driving while under the influence of alcohol,[4] its .15% blood-alcohol level presumptive of this offense was the most permissive. MOTOR

---

[3]The presumptions were as follows: (1) if there was .05% or less alcohol in the defendant's blood, it was presumed that the defendant was not under the influence; (2) if there was in excess of .05% but less than .15% alcohol in the defendant's blood, such fact did not give rise to any presumption that the defendant was or was not under the influence; and (3) if there was .15% or more alcohol in the defendant's blood, it was presumed that the defendant was under the influence. *N.J.S.A.* 39:4–50.1.

[4]As originally enacted, *N.J.S.A.* 39:4–50(a) subjected those convicted of a first offense of driving while under the influence to a license forfeiture of two years, while subsequent violators had their licenses suspended for ten years. These were the most severe license suspension penalties in the nation. *See* MOTOR VEHICLE STUDY COMMISSION, REPORT TO THE SENATE AND THE GENERAL ASSEMBLY OF 1975, at 135.

VEHICLE STUDY COMMISSION, REPORT TO THE SENATE AND THE GENERAL ASSEMBLY OF 1975 (Report), at 135. An enormous amount of research has clearly established that driving is significantly impaired at blood-alcohol levels well below .15%:

> Most persons are impaired at 0.08 percent blood alcohol concentration, and it is generally agreed that almost everyone experiences reduced driving ability at and above 0.10 percent blood alcohol concentration.... [A] driver at 0.10 percent blood alcohol concentration is five to six times more likely to cause a crash than an alcohol-free driver. [*Report, supra,* at 141–42.] [5]

As a result of these mounting scientific findings, the Legislature, in 1983, adopted the current language of *N.J.S.A.* 39:4–50(a) making a .10% blood-alcohol level a *per se* offense.[6]

*N.J.S.A.* 39:4–50(a), as currently enacted, expresses a clear legislative purpose to rely exclusively upon breathalyzer test results whenever possible.[7] The Legislature has determined

---

[5]The New Jersey courts have accepted these scientific findings as valid. *See State v. D'Agostino, supra,* 203 *N.J.Super.* at 75 " '[i]t seems to be the general consensus of scientific thought that almost every driver will experience significant impairment of driving ability at a BAC [blood alcohol concentration] level of .05% to .08%. Thus, in declaring driving or control of a vehicle illegal at .10% the legislature has proscribed driving at a *level where virtually every driver would be a danger to the public.'* " (quoting *Fuenning v. Super.Ct. In & For Cty. of Maricopa,* 139 *Ariz.* 590, 680 *P.*2d 121, 126 (1983)).

[6]This change was accommodated in *N.J.S.A.* 39:4–50.1, which no longer provides for a presumption of intoxication. In addition, a blood-alcohol concentration in excess of .05% but less than .10%—not .15% as previously enacted—gives rise to no presumption that a defendant was or was not under the influence.

[7]Other sections of the drunk-driving statutes emphasize the dispositive weight which the Legislature has placed upon breathalyzer test results. *See, e.g., N.J.S.A.* 39:4–50.2 which provides:

> Any person who operates a motor vehicle on any public road ... in this State shall be deemed to have given his consent to the taking of samples of his breath;

*N.J.S.A.* 39:4–50.4a which states:

> The municipal court shall revoke the right to operate a motor vehicle of any operator who, after being arrested for a violation of [*N.J.S.A.* 39:4–50], shall refuse to submit to [a breathalyzer test].

.

that a person who drives after drinking a sufficient amount of alcohol to result in a blood-alcohol level of .10% is a menace to himself and to others who use this State's roadways. Once again, the primary purpose behind the 1983 Amendment to the statute was to streamline the administration of the penal and regulatory laws in this area by eliminating the necessity for expert testimony at trial. As the court noted in *State v. D'Agostino, supra*, 203 *N.J.Super.* at 73:

> The purpose of the statute is not to relieve the State of its burden to prove the defendant's guilt beyond a reasonable doubt or to shift to the defendant the burden to prove his innocence. It:
>
> ... simply removes the necessity of providing an expert at each trial to testify to the effect of that percentage of alcohol upon the defendant's ability to drive. (quoting *State v. Ball*, [164 *W.Va.* 588] 264 *S.E.*2d 844, 846 (W.Va.1980)).

Essential to the development of this enforcement and administrative scheme has been the recognition of the validity of breathalyzer and other tests for determining blood-alcohol levels. In this area, also, the Court has consistently sought to eliminate the necessity for expert testimony. In *State v. Johnson, supra*, 42 *N.J.* 146, we examined, for the first time, the accuracy and reliability of breathalyzer tests for determining a person's blood-alcohol concentration. The Court held:

> "The Drunkometer is sufficiently established and accepted as a scientifically reliable and accurate device for determining the alcoholic content of the blood to admit testimony of the reading obtained upon a properly conducted test, without any need for antecedent expert testimony by a scientist that such reading is a trustworthy index of blood alcohol, or why." *Id.* at 171 (adopting the holding of *State v. Miller*, 64 *N.J.Super.* 262, 268 (App.Div.1960)).

The Court ruled that breathalyzer test results are admissible upon a simple certification as to the operability and accuracy of the breathalyzer instrument used to perform the test. *Id.* at 171.[8] We concluded that expert testimony attacking the accu-

---

[8]The Court held that before admitting breathalyzer test results into evidence the State must clearly establish that (1) the equipment was in proper working order; (2) the operator was qualified to administer the test; and (3) the test was given correctly. *State v. Johnson, supra*, 42 *N.J.* at 171.

racy and reliability of breathalyzer tests, while "probably technically still admissible," had virtually no probative value. *Id.*

In *Romano v. Kimmelman, supra,* 96 *N.J.* 66, the Court was presented, once again, with a challenge to the accuracy of breathalyzer test results. There, plaintiffs alleged that the breathalyzer models used in New Jersey were unreliable because of their susceptibility to radio frequency interference. We reiterated our holding in *State v. Johnson, supra,* 42 *N.J.* 146, that "in its totality" the breathalyzer produces a scientifically accurate measure of a person's blood-alcohol level. *Romano v. Kimmelman, supra,* 96 *N.J.* at 82. While it was necessary to establish certain conditions of testing with regard to one of the breathalyzer models, we once again eschewed the need for expert testimony.

In sum, an analysis of the legislative and administrative scheme for enforcing New Jersey's drunk-driving statutes shows that it is extremely unlikely that the Legislature contemplated the admission of conflicting expert extrapolation testimony at trials under *N.J.S.A.* 39:4–50(a). As noted, the Legislature's activities in this area have consistently emphasized the minimization, if not elimination, of expert testimony at these trials. An interpretation of the statute which would permit extrapolation evidence would frustrate and impede this strong and consistent regulatory scheme.

In deriving legislative intent, the historical evolution of the particular statute can be instructive. *State v. Madden,* 61 *N.J.* 377, 389 (1972). As originally proposed, the amended *N.J.S.A.* 39:4–50(a) would have provided:

A person charged under ... this section whose blood alcohol concentration is 0.10% or more by weight as shown by a chemical analysis of a blood, breath, urine or other bodily substance sample taken within four hours of the alleged offense shall be guilty of [operating a motor vehicle while under the influence of intoxicating liquor.]

Defendant argues that the existence of this proposal clearly indicates that the Legislature considered enacting a statute that would have embraced the holding of the Appellate Division

below. According to defendant, the fact that this proposal was rejected evidences a legislative intent to focus on the time of driving rather than on the time of testing.

However, the Legislature's deletion of the four-hour test period from the 1983 amendment actually supports an interpretation of the statute that precludes extrapolation evidence. This removal indicates that the Legislature was unwilling to impose any arbitrary limitation upon the time in which a chemical test must be administered for the purpose of using that test result to establish a defendant's blood-alcohol concentration. In accord with our perception of the legislative intent, we conclude that the statute calls for the administration of a breathalyzer test within a reasonable time after the defendant was actually operating his vehicle.

Finally, considerations of public policy are highly relevant in confirming the proper understanding to be accorded a statute. *Morss v. Forbes*, 24 *N.J.* 341, 357 (1957). The policy considerations in favor of an interpretation of *N.J.S.A.* 39:4–50(a) that posits exclusive reliance upon breathalyzer test results and eschews extrapolation evidence are overwhelming. Those who drive after drinking enough alcohol to ultimately result in a blood-alcohol concentration of .10% or greater are a menace to themselves and to all others who use the roadways of this State. There is no rational reason why prosecution of these individuals must depend upon the entirely fortuitous circumstance of the time they were apprehended by the police. The Appellate Division grasped this essential point in ruling that an interpretation of the statute that would require or permit extrapolation evidence would produce anomalous results inconsistent with the intent of the Legislature. The court stated that such an interpretation would allow drunk drivers—"moving time bombs"—to escape prosecution simply because, at the time of the stop, their blood-alcohol had not yet reached the proscribed level. 208 *N.J.Super.* at 347. As the court observed: "The law was not intended to encourage a perilous race to reach one's destination, whether it be home or the next bar,

before the blood alcohol concentration reaches the prohibited level." *Id.*, at 348.[9] This reasoning is completely consistent with our decisions holding that even before a vehicle is put in motion, a drunk driver offends the law when he evinces an intent to drive his car. *See, e.g., State v. Mulcahy, supra,* 107 *N.J.* 467. The police in this context need not wait for the time bomb to to detonate.

Defendant's arguments in support of a contrary interpretation of the statute are not persuasive. First, defendant asserts that those individuals who are apprehended before their blood-alcohol levels reach .10% can still be prosecuted under the first provision of *N.J.S.A.* 39:4–50(a), which proscribes driving while under the influence of alcohol. This contention completely ignores the rationale behind the Legislature's reliance upon breathalyzer test results. As noted, it is "the general consensus of scientific thought that almost every driver will experience significant impairment of driving ability at a BAC [blood-alcohol concentration] level of .05% to .08%." *State v. D'Agostino, supra,* 203 *N.J.Super.* at 74. Moreover, there will undoubtedly be those who have imbibed the prohibited quantity of alcohol and yet, at the time of arrest, not display sufficient symptoms to warrant a finding of guilt under the first provision

---

[9]In several unreported decisions, the Appellate Division has followed the *Tischio* decision, holding that expert extrapolation testimony is not a viable defense under *N.J.S.A.* 39:4–50(a). However, in *State v. Allen,* 212 *N.J.Super.* 276 (Law Div.1986), the trial court differed sharply. There, the defendant was charged with driving with a blood-alcohol level of .10% or greater. The defendant was given two breathalyzer tests which produced consecutive readings of .13% and .14%. However, he was prepared to produce expert testimony that, at the time of arrest, his blood-alcohol level was below .10%. *Id.*, at 277. The trial court first stated that the Appellate Division's ruling in *Tischio* had been "widely misread" and that much of the opinion was "dicta." *Id.*, at 278. After an analysis of the statutory language and legislative history of *N.J.S.A.* 39:4–50(a), the court held that the relevant time for considering a defendant's blood alcohol level is at the time of operation of the motor vehicle. *Id.* at 283. In light of our holding here, this decision is disapproved.

of the statute.[10] The essential point is that somewhere "down the road" disaster may result. By making a .10% blood-alcohol level a *per se* offense, the Legislature has sought to remove these drivers from the State's roadways before the "potential danger [becomes] a real one." *State v. Jeannette,* 172 *N.J.Super.* 587, 592 (Law Div.1980).

In addition, defendant argues that under our interpretation of *N.J.S.A.* 39:4–50(a), a person who has a few drinks at a neighborhood bar, drives home safely, and watches television for one hour, can still be convicted if, while watching television, his blood-alcohol level exceeds .10%. This assertion is farfetched inasmuch as a driver cannot be detained for the purpose of testing unless the arresting officer has probable cause to believe that the person was driving while under the influence of alcohol. *N.J.S.A.* 39:4–50.2 and *N.J.S.A.* 39:4–50.4a. *See State v. Mulcahy, supra,* 107 *N.J.* 467, *State v. Wright, supra,* 107 *N.J.* 488.

■ Finally, defendant contends that our construction of the statute encourages police officers to subject an accused to prolonged detention and repeated testing in the hope that the driver's blood-alcohol will ultimately reach the .10% level. As to this contention, the authority for the extended detention of a driver, under *N.J.S.A.* 39:4–50(a), is doubtful. Moreover, we now hold that breathalyzer tests must be taken "within a reasonable time" after the arrest.

## IV.

We are satisfied that *N.J.S.A.* 39:4–50(a), which prohibits a person from "operat[ing] a motor vehicle with a blood alcohol concentration of 0.10% or more by weight of alcohol," requires interpretation. The statute is not plain or unambiguous, and its

---

[10]It has been estimated that police officers fail to identify 50% of those drivers with a blood-alcohol concentration at or above .10% on the basis of non-driving balance and coordination tests. Report, *supra,* at 141.

provisions are not susceptible of a simple application in accordance with a strict reading of its language. The correct interpretation of the statute must effectuate the underlying legislative intent, comport with the legislative and regulatory scheme of which it is an integral part, be consistent with its relevant history, and advance considerations of sound public policy.

Accordingly, we hold that the statute prescribes an offense that is demonstrated solely by a reliable breathalyzer test administered within a reasonable period of time after the defendant is stopped for drunk driving, which test results in the proscribed blood-alcohol level. Prosecution for this particular offense neither requires nor allows extrapolation evidence to demonstrate the defendant's blood-alcohol level while actually driving.

For the reasons set forth in the opinion, the judgment below is affirmed.

CLIFFORD, J., dissenting.

Uncompromising enforcement of laws designed to rid our highways of the scourge of the drunk driver ranks only slightly behind the veneration of motherhood and probably slightly ahead of a robust hankering after apple pie in the hierarchy of values firmly embedded in our culture. And that surely is as it should be. The Court outdoes itself, however, in support of that eminently desirable enforcement objective by effectively writing a new statute—one that establishes wholesome social policy and hence might well attract my support were I a member of the legislative branch. But I am not, any more than are my colleagues, so it does not. In my view the Court has "ventured beyond the bounds of 'interpretation' or 'construction' and into the realm of 'creation' and 'substitution.'" *Crewe Corp. v. Feiler*, 28 *N.J.* 316, 330–31 (1958) (Wachenfeld, J., dissenting).

The statute at issue, *N.J.S.A.* 39:4–50(a), makes it unlawful for a person to "operate[ ] a motor vehicle while under the

influence of intoxicating liquor * * * [or] with a blood alcohol concentration of 0.10% or more by weight of alcohol in the defendant's blood * * *." The majority holds, *ante* at 506, (1) that "it is the blood-alcohol level at the time of the breathalyzer test that constitutes the essential evidence" of the statutory offense, and (2) that "extrapolation evidence is not probative of this statutory offense and hence is not admissible." The first strikes me as unnecessarily fuzzy, the second as just plain unsound, and in combination they amount to a holding that the critical time for determining whether a statutory violation has occurred is the time the blood-alcohol test is administered rather than, as I believe to be unmistakable from the statute, when the defendant was actually operating the vehicle.

Because the Court has treated with unbecoming irreverence the statute the legislature has given us, taken liberties with the legislative history, given short shrift to an impressive body of respectable authority both in this state and elsewhere, and dismissed the sound position of the chief law enforcement officer of the State of New Jersey, who has primary responsibility for the faithful execution of the criminal laws, I dissent.

I

At trial the State produced the testimony of the arresting officer and introduced the results of two breathalyzer tests, the first administered sixty minutes and the second seventy minutes after defendant was arrested. Each test yielded a blood-alcohol reading of .11%. The municipal court denied defendant's motion for acquittal at the conclusion of the State's case, whereupon defendant presented expert testimony to the effect that if the alcohol content was .11% by weight in defendant's blood sixty and seventy minutes after the arrest, then at the time the officer stopped defendant the blood-alcohol content was .07%. At the conclusion of all the evidence the municipal court, after first declaring a "substantial doubt" that defendant had been driving while under the influence, found defendant

guilty of operating his motor vehicle with a blood-alcohol concentration of ".10% or more." On a trial *de novo* the Law Division held that the State bore the burden of establishing that defendant's blood-alcohol concentration exceeded .10%, that the State had met that burden, and that the burden "then shift[ed] to defendant * * * to indicate by expert opinion that the .11 reading was not applicable." Because the court was not "swayed" by defendant's proof and did not think defendant had "rebutted anything in the State's case," defendant was convicted of the statutory violation.

On appeal to the Appellate Division the case took a bit of a barmy twist. The parties assumed that the relevant time for considering defendant's blood-alcohol level under *N.J.S.A.* 39:4-50(a) was the time defendant was actually operating the motor vehicle. As perceived by both the State and the defendant the controversy in the court below focused on who had the burden of extrapolating breathalyzer results back to this critical period—the time of operation. On this issue the Appellate Division rejected defendant's contention that the State, as part of its case in chief, must relate breathalyzer test results back to the time of driving. The court held:

> [W]e do not accept defendant's premise that the State, after obtaining a breathalyzer reading of .10 percent or greater, must demonstrate through clear scientific evidence or expert testimony that the blood alcohol level was greater than .10 percent at the exact time of operation of the vehicle. [*State v. Tischio*, 208 *N.J.Super.* 343, 347 (1986).]

I pause to express agreement with that holding: the State need not produce "clear scientific evidence" or "expert testimony" on its case. The problem is created in the next succeeding paragraph of the Appellate Division opinion, containing two significant propositions entirely of the court's own creation, not having been argued by either side:

> The statute reflects a simple legislative plan to establish a violation where the administration of the breathalyzer or other established tests for determining blood alcohol content produces a reading of .10 percent blood alcohol or greater *at any time* after operation so long as there has been no ingestion of alcohol between the time of operation and the time of testing. Further proof on the

issue of the blood alcohol level at the time of operation is unnecessary. [*Ibid.* (emphasis added).]

At least one court has characterized the foregoing language of the Appellate Division as no more than *dicta* and therefore not binding if unable to withstand vigorous independent analysis. See *State v. Allen*, 212 *N.J.Super.* 276, 279–80 (1986), in which the Law Division held—correctly, in my view—that the relevant time for considering a defendant's blood-alcohol level is at the time of actual operation of the motor vehicle. *Id.* at 281–83. I gather that the Court is reluctant to come right out and express its agreement with that fundamental proposition. The opinion skirts the issue with the statement, *ante* at 509, that the blood-alcohol content at the time of the breathalyzer test is the essential evidence of the offense; but that does not tell us what the offense is. Inasmuch as the Court declares extrapolation evidence to be non-probative, I assume that it considers the offense to have been committed when a post-driving test produces a reading in excess of the stated level, without any conclusion required on what the content was at the time of driving. Clearly contrary to the Appellate Division, and apparently contrary to my colleagues, I would hold that the offense is *operating* a motor vehicle with a blood-alcohol content in excess of the specified level.

The statute says so. It is directed at "[a] person who operates a motor vehicle * * * with a blood alcohol concentration" above the specified level. As a criminal enactment it must be strictly construed. *E.g., State v. Maguire*, 84 *N.J.* 508, 514 n. 6 (1980); *State v. Grant*, 196 *N.J.Super.* 470, 480–81 (App.Div.1984). To make the point I must conquer a dreadful case of insecurity, a feeling bordering on paralyzing intimidation born of the recent discovery, hammered home with painful frequency, that language so transpicuous to me means something entirely different to my colleagues, see, *e.g., State v. Valentin*, 105 *N.J.* 14 (1987) (criminal statute); *In re Perez*, 104 *N.J.* 316 (1986) (affidavit); *Meier v. New Jersey Life Ins. Co.*, 101 *N.J.* 597 (1986) (life insurance policy and relevant doc-

uments), whereas language that confounds me with its inscrutable rococo curlicues causes not a bat of the eye in other members, see *State v. Lee,* 96 *N.J.* 156 (1984). But out with it: I view the statutory language as plain and unambiguous. It refers to the offense occurring at the time of driving and not at the time of testing. The verb "to operate" is "definite, clear and distinct, readily understood and employed in the every-day speech of the man on the street. Refined definition is unnecessary." *State v. Lashinsky,* 81 *N.J.* 1, 9 (1979) (quoting *State v. Furino,* 85 *N.J.Super.* 345, 348 (App.Div.1964)).

The majority resists a reading of the statute that zeroes in on the time of operation of the vehicle *not* because there is anything unclear about what the legislature said, but because the Court concludes that what the legislature said makes enforcement awkward, cumbersome, difficult. It need not. I should think we could accommodate the words the legislature used and what the Court sees as the legislative intent by making a more–than–.10% reading *prima facie* evidence, rather than *conclusive* proof, of a violation while driving, provided that the reading is obtained, as in this case, within a reasonable time after the arrest. Such a rule would be based on reasonable legislative assumptions, including the current state of knowledge of burn-off rates, subject however to attack in the form of expert extrapolation testimony to be produced by the defendant. Surely a defendant should be allowed to show, through expert proof extrapolating the breathalyzer results back to the time of operation, that the State's *prima facie* case has been overcome, and that in fact the proofs are insufficient to establish beyond reasonable doubt an excessive reading at the time the vehicle was being driven. If, as I am convinced, the statutory offense is *driving* with a blood-alcohol content over .10%, then it can hardly be denied (but the Court denies it) that extrapolation evidence is probative. And that view of the offense and of the probative value of extrapolation evidence represents exactly the position of the Attorney General, *amicus* in this Court, of which more below.

As against the fear that a rule allowing defense extrapolation would turn what the legislature sought to streamline into a tedious and prolonged battle of experts, I suggest that only in the "borderline" case, one in which, as here, the evidence of drunk driving is thin and a conviction on the second prong of the statute—the over–.10%–prong—is based on breathalyzer readings that at the time of testing are so close to the line as to lend themselves to a sensible extrapolation argument, will a defendant likely expend the effort required to mount such a defense. We will, I suspect, see few of them.

## II

That the rule proposed in this opinion, making time of operation rather than time of testing the critical time, and therefore rendering a defendant's extrapolation evidence probative, is consistent with what the legislature had in mind becomes clear when we examine other sections of the drunk-driving laws, keeping in mind the principle that "[a] statute is to be construed as a whole with reference to the system of which it is a part * * *. The import of any word or phrase is to be gleaned from the content and statutes in *pari materia.*" *State v. Brown,* 22 *N.J.* 405, 415 (1956); *see State v. Lee, supra,* 96 *N.J.* at 161; *Brewer v. Porch,* 53 *N.J.* 167, 174 (1969); *Giordano v. City Comm'n of Newark,* 2 *N.J.* 585, 594 (1949). Prior to 1983, *N.J.S.A.* 39:4–50.1 stated in relevant part:

In any prosecution for a violation of *R.S.* 39:4–50 relating to *driving a vehicle* while under the influence of intoxicating liquor, the amount of alcohol in the defendant's blood *at the time alleged* as shown by chemical analysis of the defendant's blood, urine, breath, or other bodily substance shall give rise to the following presumptions:

(1) If there was *at that time* 0.05% or less by weight of alcohol in the defendant's blood, it shall be presumed that the defendant was not under the influence of intoxicating liquor;

(2) If there was *at that time* in excess of 0.05% but less than 0.10% by weight of alcohol in the defendant's blood, such fact shall not give rise to any presumption that the defendant was or was not under the influence of intoxicating liquor * * *.

(3) If there was *at that time* 0.10% or more by weight of alcohol in the defendant's blood, it shall be presumed that the defendant was under the influence of intoxicating liquor. (Emphasis added).

The emphasized language makes plain that this section was concerned with the time of operation of the motor vehicle and not with the time of the breathalyzer test. In 1983, paragraph (3) was deleted and the current language of *N.J.S.A.* 39:4–50(a) was adopted making a .10% blood-alcohol level a *per se* offense. However, nothing about this change indicates a legislative intent to focus on the time of testing rather than on the time of driving. As stated above, *N.J.S.A.* 39:4–50(a) is directed towards the person who "operates a motor vehicle." Moreover, paragraphs (1) and (2) of *N.J.S.A.* 39:4–50.1 are still in effect. As the court noted in *Allen, supra,* 212 *N.J.Super.* at 282, the approach taken by the Appellate Division in *Tischio* (and now approved by the majority) "produced a very peculiar legislative plan for DWI cases: the under–0.10% rules apply to the time of driving, while the over–0.10% rule applies to the time of testing."

Furthermore, other sections of the drunk driving law indicate that the legislative purpose looks to the time of driving. *N.J. S.A.* 39:4–50.2 provides:

Any person *who operates* a motor vehicle on any public road * * * in this State shall be deemed to have given his consent to the taking of samples of his breath * * * provided, however, that the taking of samples is made * * * at the request of a police officer who has reasonable grounds to believe that such person has been *operating a motor vehicle* in violation of the provisions of [*N.J.S.A.* 39:4–50] (emphasis added).

The emphasized language again makes it clear that the critical time is the time of operation. *N.J.S.A.* 39:4–50.4a states:

The municipal court shall revoke the right to operate a motor vehicle of any operator who, after being arrested for a violation of [*N.J.S.A.* 39:4–50], shall refuse to submit to the chemical test * * *. The municipal court shall determine by a preponderance of the evidence whether the arresting officer had probable cause to believe that the person had been *driving* or was in *actual physical control* of a motor vehicle * * * while under the influence of intoxicating liquor. (Emphasis added).

Once again, it is apparent that the legislature was concentrating on the time of driving.

In *Perez v. Pantasote, Inc.*, 95 *N.J.* 105, 116 (1984), this Court articulated "the general rule that a word or phrase should have the same meaning throughout the statute in the absence of a clear indication to the contrary." The above analysis of the language of *N.J.S.A.* 39:4–50(a), and the statutes in *pari materia* with it, supports the position that the Court is demonstrably in error in looking to the time of administration of the breathalyzer tests.

### III

The view expressed above draws additional strength from the legislative history. In *State v. Madden*, 61 *N.J.* 377, 389 (1972), this Court declared:

> We must enforce the legislative will if it is within the constitutional limits whether we approve of the legislative intent or not. But it is our initial task to seek that intent, and to that end we must consider any history which may be of aid.

The Assembly Committee statement attached to the 1983 amendment to *N.J.S.A.* 39:4–50 says: "The bill, in its substitute form, requires that a person whose blood alcohol concentration is 0.10% or greater be considered guilty of driving while intoxicated. Current law merely creates a presumption that such a person was under the influence of intoxicating liquor." This statement does not deal with the issue of when the proscribed blood-alcohol level must exist. However, by relating the new provision to that which was deleted, it is fair to assume that the legislature intended to continue to make pivotal the time of driving rather than, as the Court would have it, the time of testing. This is especially true in light of the statutory language ultimately used.

The remainder of the committee statements reveals only that the drunk driving law was amended so that New Jersey would meet the federal eligibility requirements for additional monetary grants.

As originally proposed, Senate Bill No. 1833 (1983 Amendments) provided in relevant part:

A person charged under * * * this section whose blood alcohol concentration is 0.10% or more by weight as shown by a chemical analysis of a blood, breath, urine or other bodily substance sample *taken within four hours of the alleged offense* shall be guilty of [operating a motor vehicle while under the influence of intoxicating liquor.] (Emphasis added).

Defendant concedes that had this proposal been enacted, he would have been guilty because his blood alcohol reading of .11% was obtained within four hours of operation. But he argues, and I agree, that this proposal demonstrates legislative consideration of a statute that would have embraced the Court's holding today and a legislative choice not to enact it. That circumstance supports the conclusion that the legislature's attention was on the time of driving rather than on the time of testing.

## IV

The foregoing conclusion finds support as well in case law both in this state and elsewhere. Before the Appellate Division decision in this case no New Jersey court had held that the critical time under *N.J.S.A.* 39:4–50(a) was the time of testing rather than the time of driving. In *State v. Miller,* —— *N.J.Super.* —— (App.Div.1985), the defendant was found guilty in the municipal court of driving with a blood alcohol level of at least .10%. This conviction was based on two breathalyzer tests administered thirty minutes and thirty-nine minutes after defendant's arrest, resulting in readings of .11% and .12% respectively. However, defendant produced an expert who testified that at the time defendant was driving, his blood alcohol level was .09%. The Appellate Division reversed the conviction on the ground that this expert testimony was uncontradicted by the State. The court held:

It is not enough simply to say, in the face of breathalyzer evidence and the expert testimony, that defendant must have had .10% blood alcohol. If the uncontradicted testimony of defendant * * * and his expert are not believed by the court, that disbelief has to be stated, along with a reasonable basis for it. [—— *N.J.Super.* at ——.]

Hence the critical time was the time of driving and not the time of testing. To the same effect see *State v. O'Connor,* ——

*N.J.Super.* —— (App.Div.1984). As the court stated in *State v. D'Agostino*, 203 *N.J.Super.* 69, 77 (Law Div.1984):

> It remains the obligation of the State to prove beyond a reasonable doubt what was the blood alcohol concentration of the defendant *at the time he was driving.* And since the breathalyzer and other scientific tests are performed some period of time after the driving has been completed, *there will always arise the problem of extrapolating the results of the scientific tests to an earlier time* to determine the condition of the defendant at the time he was operating a motor vehicle. (Emphasis added).

Prior to the 1983 Amendment to *N.J.S.A.* 39:4–50(a), the case law held that the stated presumptions contained in *N.J.S.A.* 39:4–50.1 arose only when the defendant's blood alcohol reached a certain level at the time of operation. In *State v. Prociuk*, 145 *N.J.Super.* 570, 576 (County Ct.1986), the court said:

> Obviously, in almost every case involving a breathalyzer the tests are given at least 30 minutes after the arrest. *The trial court then infers what the reading was at the time defendant operated his motor vehicle.* Since breathalyzers are not kept in police vehicles, there is no other practical way to use a breathalyzer. (Emphasis added).

Thus, today's opinion represents a clear departure from existing interpretations of *N.J.S.A.* 39:4–50(a).

Authority elsewhere is likewise against today's holding. Several of our sister states have enacted "per se" statutes that, unlike the one before us, expressly look to the time of testing rather than, or in addition to, the time of driving. *See State v. Sigmon*, 74 *N.C.App.* 479, 328 *S.E.*2d 843 (1985); *People v. LaMontagne*, 91 *Misc.*2d 263, 397 *N.Y.S.*2d 872 (App.Term 1977); *Slaughter v. State*, 322 *A.*2d 15 (Del.Super.1974); *Minn. Stat.Ann.* (Highway Traffic Regulation) Sec. 169.121, Subdivision 1 ("It is a misdemeanor for any person to drive * * * any motor vehicle within this state * * * (d) when the person's alcohol concentration is .10 or more; or (e) when the person's alcohol concentration as measured within two hours of the time of driving is .10 or more."); *Okla.Stat.Ann.* (Motor Vehicles) 47 Sec. 11–902A1 ("It is unlawful * * * for any person to drive * * * a motor vehicle within this State who: 1. Has a blood or breath alcohol concentration * * * of ten-hundredths (0.10) or more at the time of a test of such person's blood or breath administered

within two (2) hours after the arrest of such person."). But those states with statutes similar to the one at issue here have uniformly rejected the interpretation landed on today by this Court. *See State v. Conway,* 75 *Or.App.* 430, 707 *P.*2d 618 (1985); *Schumaker v. State,* 704 *S.W.*2d 548 (Tex.Crim.App. 1986). In fact, some jurisdictions have gone so far as to hold that "relation back testimony is necessary to establish the defendant's blood alcohol content at the time of actual operation." *State v. Dumont,* 146 *Vt.* 252, 499 *A.*2d 787, 789 (1985). Similarly, the Court of Appeals of Idaho refused to accept the time of testing in *State v. Knoll,* 110 *Idaho* 678, 718 *P.*2d 589 (1986). The court held that the "lapse of time between an alleged offense and the administration of a blood-alcohol test" goes to the weight of that evidence. *Id.,* 718 *P.*2d at 594; *see also State v. George,* 77 *N.C.App.* 470, 472, 336 *S.E.*2d 93, 95 (1985) (evidence of blood-alcohol level more than three hours after defendant drove sufficient to survive motion to dismiss charge of driving under influence). And in *People v. Pritchard,* 162 *Cal.App.3d Supp.* 13, 15, 209 *Cal.Rptr.* 314, 315 (App.Dep't Super.Ct.1984), the court stated:

> In order to support a conviction of a violation of [the statute], "the People * * * must prove beyond a reasonable doubt that at the time he was driving, [the defendant's] blood alcohol exceeded 0.10 percent." Generally, this will have to be established by circumstantial evidence. (Citation omitted).

## V

I would therefore hold, consistent with the view of the Attorney General, that a breathalyzer test result obtained a reasonable time after an arrest should be viewed as indicating "the presumptive equivalent of the amount of alcohol at the time the offense was committed." The Attorney General made explicit at oral argument before this Court what is implicit in the foregoing from his brief, namely, that the critical time of the offense is the time the vehicle is operated. To be precise, the Deputy Attorney General acknowledged his disagreement with the Appellate Division's interpretation of *N.J.S.A.* 39:4–50(a), the position of his office being that the statute requires a

demonstration of "a .10% [blood alcohol content] or greater at the time of operation." Moreover, the Attorney General concedes that the State's *prima facie* case can be defeated by persuasive extrapolation evidence, on the production of which the defendant bears the burden. I agree.

I agree not just because I have worked my way through the problem to the same answer as that reached by the Attorney General, but I agree because I am satisfied that in this case we should pay heed to the position of the State's chief law enforcement officer. On questions of law—here, criminal law—that officer's view is entitled to no more deference than that of any other litigant; but on questions that turn in large measure on how, as a practical matter, those laws are enforced in the field and pursued in the courtroom, the Attorney General knows more than do the members of the Court. At least more than *this* member of the Court. It is his resources, and those of the county prosecutors under his supervision and the various municipal enforcement agencies, that are at risk. And if he believes—as he does—that the system can work by treating a breathalyzer reading taken a reasonable time after arrest as establishing a *prima facie* case, and then permitting a defendant to come forward with extrapolation evidence for the purpose of overcoming that *prima facie* case, then I for one would give some deference to that position to the extent that it affects our resolution of the case. We invited the Attorney General's participation in this case as *amicus*. That means he is a friend of the Court, here to help us. I would accord him a more friendly reception than he has received at the hands of the Court.

I would reverse and remand for retrial consistent with the propositions stated in this opinion.

*For affirmance*—Chief Justice WILENTZ and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—6.

*For reversal and remandment*—Justice CLIFFORD—1.